(36 South. 853.)

No. 15,090.

SHREVEPORT COTTON OIL CO. v. FRIEDLANDER et al.*

(May 23, 1904.)

SALE BY SAMPLE—EVIDENCE—INADMISSIBILITY—REFUSAL TO ACCEPT—INSUFFICIENT PERFORMANCE.

1. Plaintiff sues for breach of contract, growing out of defendants' refusal to receive the by-products of its oilmill (of plaintiff), consisting of linters, grabbots, and flues, bought by the defendants from plaintiff in December, 1901.

2. The plaintiff's contention is that defendants bought according to sample, while the defendants deny that samples were mentioned in connection with the kind or quality of the products.

3. The judge of the district court decided the contention in favor of plaintiff. On the appeal the court holds that it has found no good

ground to reverse the judgment, rejecting the main demand.

4. Without reference to samples, the plaintiff did not tender to defendants a quality equal to that sold.

5. The mill run for the season of 1900 and 1901 was bought by defendants.

Prior to delivery of part of the products sold, and prior to the refusal of defendants to receive those tendered because the quality was inferior, part of the output had been so disposed of by plaintiff that it could not deliver them to defendants.

6. The contract was not indivisible. It was not a unit in the sense that plaintiff could withhold part of the output, and obtain damages from the defendants for not accepting the remainder.

7. The broken condition of the contract on the part of plaintiff terminated the indivisibility or unity of the contract.

8. If the rule were followed that a vendor could recover a claim in damages, although he himself had not strictly complied with his contract, it would, in some respects, put the buyer at the mercy of his vendor, which was never intended by the law. To recover damages, the vendor must begin by showing that he has complied with the terms of the contract, otherwise he cannot be heard to say that he must be reinstated in the situation in which things were at the date the contract was entered into.

(Syllabus by the Court.)

Appeal from Third Judicial District Court, Parish of Bienville; Ben P. Edwards, Judge.

Action by the Shreveport Cotton Oil Company against O. O. Friedlander and others. Judgment for defendants, and plaintiff appeals. Affirmed in part.

Herndon & Herndon (Walker B. Spencer, of counsel), for appellant. John C. Theus, Edward Hughes Randolph, and Farrar, Jonas & Kruttschnitt, for appellees.

BREAUX, J. Plaintiff, the Shreveport Cotton Oil Company, brought suit against Friedlander, the defendant, an absentee, for damages in the sum of $7,264.83, and alleged that defendant Friedlander had broken his contract, in which he had bound himself to buy the output of linters, grabbots, and flues of the mill of the plaintiff company for the season of 1900–1901.

---

*Rehearing denied June 20, 1904.

Through the process of attachment, and the seizure thereunder of property of one of the defendants, plaintiff obtained judgment.

The defendants answered, and, in addition, pleaded in reconvention. Judgment went against plaintiff on the main demand, and, in effect, disposed of defendants' reconventional demand against his demand.

The contracts sued on are in the form of letters or memoranda written on December 14, 1900, in which plaintiff states that the letter or memorandum "serves as an acceptance of your offer of three and three-quarter cents per pound f. o. b. mill for output of linters at the close of the present season of 1900 and 1901, mill run, making the entire output, shipments in car-load lots as made, draft attached to bill of lading on the above address.

"We hereby acknowledge receipt of check for three hundred dollars on contract, same to be credited on invoices, as linters are shipped. This contract applies to the linters made after completing a contract of four hundred bales that are being shipped at the present time."

The letter or memorandum is signed by plaintiff, and the acceptance of its terms, which is subjoined to the letter, is signed by defendants. Plaintiff says that the paper in question is a letter, while defendants say that it is a mere memorandum.

In a second letter or memorandum of the same date, defendants are informed by plaintiff that it accepts defendants' offer of six cents for its (plaintiff's) output of grabbots, f. o. b. mill. To quote from the letter:

"Shipment as we get car-load lots, or at the close of the season whatever we have, to be shipped along with the linters in order to obtain the best rates possible."

"We also accept your offer of the two cents per pound for our season's output of mill-run flues, shipment in carload lots or with linters as above. Draft against bill of lading as usual on above address."

This letter or memorandum is signed by the plaintiff and defendants.

Plaintiff avers in its petition, substantially, that defendants notified it that they (defendants) would not comply with their contracts; that thereupon plaintiff made a tender of its mill products, and offered to ship and deliver them according to contract, which was refused, and that after the refusal it sold the linters, flues, and grabbots that it had sold to defendants, in the market, for the best price obtainable; and that it all resulted in a loss, in difference in prices between what same was sold to defendants and what was obtained for it in the market. Plaintiff now claims this difference.

Defendants charge that plaintiff acted in fraudem legis; that it sought an undue advantage.

The defendants' further contention is that they bought by samples which were produced by plaintiff to show the grades of the output of the mill, and that at the same time plaintiff said that the entire output would be between 800 and 900 bales, and that 400 bales were already sold, and, upon inspection of samples furnished by plaintiff to defendants, the latter offered 3¾ cents per pound for the output of linters made, and it was accepted by the general manager of plaintiff's company, and that the written memorandum (or letter, according to plaintiff) was afterward prepared and signed as before stated, and that subsequently, on the same day, the general manager of plaintiff proposed to sell to defendants grabbots and mill flues, and that, after stating that he had none of these products in bales, he sent out and obtained loose samples, and submitted to one of the defendants (O. O. Friedlander) for inspection, and that after having been assured that the output would be about 50 bales of the one, and 25 bales of the other, and that the samples represented the true product of the mill, a deal was closed for these outputs at 6 cents per pound for one, and 2 cents for the other, and then the second letter or memorandum above mentioned was signed, and

the samples, or a portion of them, were mailed by plaintiff to the New York office of defendants.

We will not take space by narrating at length the averments of plaintiff and defendants. It suffices to state, in addition to that which has been said regarding this cause, that defendants charge that plaintiff violated its contract by diverting part of the products which it had sold to them.

On cross-examination the general manager of the plaintiff company testified that he had sold 775 bales. That was 355 bales over the number he reserved the right not to sell to defendants from the products of the season of 1900 and 1901.

In examination in chief he testified that no bales were sold by him after the contract had been signed.

The contract called for all the output of the season of 1900 and 1901. He also delivered, as we read the testimony, linters to the Shreveport Manufacturing Company:

"Mr. Harmon, you delivered to the Shreveport Manufacturing Company ten bales on January 1, 1901?

"Ans. We delivered to them linters of date of January 1, 1901. In all, about ten bales."

Plaintiff shipped 100 bales of linters to defendants, and, on presentation of the bill of lading, the draft of plaintiff was paid, and very soon thereafter samples were received. That, not a great while after, plaintiff shipped 50 bales of linters and 18 bales of flues and 11 bales of grabbots to defendants. The draft of plaintiff was paid by defendants the day before the samples were received by defendants. The linters and other products were consigned to defendants in Bremen, Germany.

From about the date these last samples were received, began the differences between plaintiff and defendants.

A member of defendants' firm, present in Shreveport on the day of the contracts to which we have referred, examined bales of linters in plaintiff's yard which were ready for shipment, from which he says he was furnished the samples before mentioned, which he himself brought back to plaintiff's office.

In this, this witness was corroborated by his brother, who was with him at the time. He further says that Harmon, plaintiff's manager, stated that they were fair samples of the quality of the linters. Harmon and his two clerks, witnesses for plaintiff, deny what these witnesses for defendants testified to in regard to samples.

They say that no samples were produced. They deny that any samples were ever sent to New York by plaintiff.

The foregoing summary of facts we deem sufficient for a decision of the case.

The following are the issues:

Plaintiff claims to have sold the output of its mill for the season of 1900 and 1901 without reference to quality. Defendants deny plaintiff's right, and aver that they (defendants) bought according to sample, and that the products sent them were not according to samples, and were of a very inferior kind.

Plaintiff urges that the written documents before mentioned as memoranda or letters should govern; that they are plain, unequivocal, and unambiguous; that the district court erred in admitting oral proof which enlarged, varied, or changed the obligation of the parties.

The written contracts contain no reference of any kind, to samples, nor representations concerning the quality or quantity of the goods sold. The testimony of the defendant O. O. Friedlander, and of his brother, to the effect that the sale was made by samples, was admitted in evidence. Three witnesses of plaintiff contradicted them on every essential point. In addition, the testimony of plaintiff's witnesses is that the quality of linters, grabbots, and flues varies during the season, according to the character and quality of seed delinted; and they swore that a

sale by sample taken from one lot would be impossible; that this sale was the entire season's output; that it would be unreasonable to assume that the plaintiff had made a sale by sample, when they themselves could not know the quality of the output throughout the entire season.

The nature of the transaction, the written correspondence between the parties, the circumstances and the testimony of the witnesses, taken as a whole, have not convinced us that the district judge erred in deciding against plaintiff, and in holding, as he must have held, that the sale was made in accordance with sample.

We will not discuss at length the question of the admissibility of testimony to add to letters or memoranda that were silent upon a most important point. Fraud and ill practice had been charged. To the extent that it was the intention to prove this allegation, the testimony was admitted, but no further. Conceding for the moment that no testimony should have been admitted to explain any asserted ambiguity, it yet remains as a fact that the buyers expected, and had the right to expect, a better quality of linters, grabbots, and flues than that which plaintiff shipped to them. The testimony shows that they were a very inferior kind. "Poor stuff" was, as we remember, the expression of one of the witnesses.

It is evident to us, after having read the evidence, that defendants intended to buy a merchantable article of the average grade that they would be enabled, as such, to sell in the market.

Upon inspection, through the agency of the Bremen Cotton Exchange in Germany, the products in question were condemned, at cost of defendants, as inferior.

Although the quality may vary, as stated by witnesses, with the uncertainties of the elements, and other conditions over which parties have no control, there must none the less be a limit to its inferiority, in order that it may be considered fair quality. If it is not up to the standard, it is not to be assumed that the buyer intended to buy it. We understand that plaintiff was to be paid a fair price. It follows that it should have delivered at least an article of average quality. This, we take it from the testimony, it did not do.

There was evidently an error committed—plaintiff in selling such an article, and defendants in buying it. No one should be expected to pay a full, fair price for an article which subjects him to cost, and to be condemned by a cotton exchange for offering an inferior output for a sound article.

This brings us to a consideration of the charge made by defendants that plaintiff cannot recover because it diverted a part of the output of its mill manufactured during the season of 1900 and 1901.

Under the terms of the contract it was to deliver to defendants all of the output of the mill in the season of 1900 and 1901, except 400 bales. The manager, Harmon, on cross-examination, said that the plaintiff had sold 775 bales. The answer—to quote from the testimony of the witness—was: "Well, sir, we had sold 775 bales." True, in examination in chief, this witness said that after December 14, 1900, the date of the contract, he had not sold the output of the mill, except to defendants. One statement may be inconsistent with the other, or it may be that the last statement related exclusively to bales sold after the sale, but he had made sales prior to the date of sale in excess of the number of bales mentioned in the contract.

There are other dealings of plaintiff, showing that linters were sold to other parties than defendants. We will not go further into details in this matter.

Plaintiff stoutly denies that it diverted any of the output. The plaintiff urges, in the al-

ternative, that, even if it had diverted the output, it would be entitled to the amount for which it sues.

Considered from any point of view, the position of plaintiff is that under the case of Barrow & Le Blanc v. Pennick & Ford, 110 La. 572, 34 South. 691, the defendants are without right to raise the objection they urge. Plaintiff's contention is that the contract was for an entire output; that, as in the cited case, it is indivisible. There is force in the position of plaintiff. The cited case does, on this question, sustain its view. But we are not bound to follow a decision that has given too great scope to the legal principles of the indivisibility of obligations. It (this decision) stands alone.

The article of the Code on the subject must govern. It provides that in commutative contracts, where reciprocal obligations are to be performed at the same time, or the one immediately after the other, the one who wishes to put the other in default must *offer to perform that which on his part was to be performed*. Civ. Code, art. 1913. (Italics ours.)

How can plaintiff offer to perform its part of the contract, if it has disposed of part of the property which should have been delivered under the contract? Plaintiff alleges that it made a tender of its output to defendants. The plaintiff could not make a tender of the entire output, for it had sold a part, which it had bound itself to deliver to defendants.

Plaintiff was entitled to the price to the extent that there had been performance, but the plaintiff could not palm off its inferior output on defendants, and sell the sound article to others. That would not be sanctioned in any market.

In order to recover damages against defendants, total performance was to be expected of the seller. Chase v. Turner, 10 La. 20; Loreau v. Declouet, 3 La. 1; Dyer

v. Seals, 7 La. 133; Taylor v. Almanda, 50 La. Ann. 351, 23 South. 365.

Even without precedent upon the subject, it would be but right to require the vendor to comply with its obligation as vendor, before granting it damages against the buyer for refusing to receive products, especially in view of the fact that it appears conclusively enough that, in addition to the diversion, the vendor attempted to deliver an inferior kind of goods, not up to the standard which we infer defendants had the right to expect.

After reconsideration, we think that the Barrow and Le Blanc decision cannot be followed on the particular point here involved: that the action was, or should have been, one exclusively to resolve the contract, and that it follows that the parties must in such a case be restored to the position they were originally; that there must be a restitutio in integrum. That is not our view. We think that the obligation of the parties remains fixed to the extent that there has been performance, and that, as to the remainder to be performed, the buyer cannot be made to accept an inferior article under the plea that the contract is to be performed as a unit.

If this were the law, as laid down in the cited case, supra, the producer might withhold and divert part of the property sold, and insist upon the buyer taking the remainder, because, forsooth, the buyer had received part of the property sold, and there would be no remedy save by the action to resolve the contract, and by reinstating the parties as they were prior to entering into the contract.

We will have to return to the first above cited cases, and hold that the vendor must be held to deliver that which it has promised to deliver, else it will not be entitled to recover damages on the buyers' refusal to receive the property. We must adhere to the articles of the Civil Code in matter of viola-

tion of commutative contracts. The articles of the Code relating to the resolutory condition have no application.

The judgment of the district court rejected plaintiff's demand, and passed the claim on the reconventional demand. We affirm the judgment of the district court on the main demand.

The testimony before us does not satisfy us that a judgment should be rendered on the reconventional demand.

We will therefore dismiss this (the reconventional) demand as in case of nonsuit.

It is therefore ordered, adjudged, and decreed that the judgment on the main demand be, and the same is hereby, affirmed, at appellant's costs.

It is further ordered, adjudged, and decreed that there be judgment of nonsuit on the reconventional demand against defendants, and that defendants and appellees pay costs of appeal on the reconventional demand.