No. 2656

Second Circuit

McLEMORE v. HEMLER

(June 2, 1926, Opinion and Decree)
(June 30, 1926, Rehearing Refused)

(*Syllabus by the Editor*)

**1. Louisiana Digest—Obligations—Par. 173.**

A party cannot enforce a contract which he himself has violated.

**2. Louisiana Digest — Obligations — Par. 181; Evidence—Par. 53.**

The burden of proof is on one suing to enforce a contract to show that he has performed his obligation.

Appeal from the Fifth Judicial District Court of Louisiana, Parish of Richland, Hon. John R. McIntosh, Judge.

Action by J. Walter McLemore against W. Felix Hemler. There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

Ellis and Ellis, of Rayville, attorneys for plaintiff, appellant.

George Wesley Smith, of Rayville, attorney for defendant, appellee.

ODOM, J. On July 1, 1925, plaintiff and defendant entered into a contract under the terms of which plaintiff was to sell to defendant fifty bales of cotton of the crop of 1925 at 21½ cents per pound, said cotton to be of the first picking.

Plaintiff delivered thirty-one bales, which were accepted by defendant.

Defendant refused to accept the other nineteen bales, on the ground, as he alleges, that the cotton was not picked and handled in accordance with the agreement and was, for that reason, of lower grade than he had a right to expect under the contract.

Plaintiff brought this suit for $1,915.22, the value of the cotton not accepted.

There was judgment in the lower court rejecting plaintiff's demand and he prosecutes this appeal.

OPINION

The contract between the parties was in writing and reads as follows, to-wit:

"Rayville, La., July 1, 1925.

"Witness this contract and agreement entered into by and between Walter McLemore, of Winnsboro, Louisiana, and W. Felix Hemler, of Rayville, Louisiana, wherein the said McLemore has contracted to sell to W. Felix Hemler 25,000 pounds of lint cotton in about 50 bales. subject to the following terms and conditions:

"It is agreed that the cotton delivered on this contract shall be grown on the seller's farm near Baskin composed chiefly of cotton grown from Cleveland Big Boll or Wanamaker Cleveland or Delfos 6102 varieties; it is also agreed that the seller will deliver to the buyer the first fifty (50) bales picked and ginned, and that the seller will endeavor through his tenants to use ordinary care and precaution in the gathering of said cotton so that as good grades as possible may be tendered on delivery; it is also agreed that the buyer shall have the right to reject any bale which does not weigh 400 pounds if he desires should such bale be tendered (this stipulation being made because any bale under 400 pounds is not of commercial weight). The buyer agrees to pay the seller (21½) twenty-one and 50-100 cents per pound for the said cotton and to pay for the same as fast as delivered. Both parties agree that the trend of the market shall have no effect upon this contract.

"Thus done and signed in the presence of the undersigned witnesses on the day and date first above written.

"Witnesses:
JESSE ANDERSON
C. McLEMORE.

"J. W. McLEMORE,
"W. FELIX HEMLER"

Defendant, as a witness in his own behalf, gave his version of the facts and circumstances leading up to the signing of the contract, and went into details as to what was the understanding between him and plaintiff. Inasmuch as this testimony was brought out by counsel for plaintiff and is in the record without objection, we think it should be considered along with the written contract, for it throws some light upon the question as to what was the understanding between the parties, and to that extent explains the contract.

His testimony referred to is as follows:

"Q. Now didn't you first try to buy this cotton from McLemore that way, basis middling?

"A. Do you want to question me or me make a statement now?

"Q. Just answer the question, please. Now, didn't you first try to buy this cotton from McLemore that way, basis middling?

"A. Mr. McLemore's brother had sold me some contract cotton and he told me that the plaintiff, Mr. J. W. McLemore, wanted to contract some cotton. I went to Winnsboro and took the matter up with Mr. McLemore; at the time he offered— he wanted to contract approximately fifteen bales of Delfos cotton and thirty-five bales of short cotton, basis middling, and strict middling, at twenty-two cents, and twenty-five cents, for the Delfos cotton, and he stated that he anticipated making about fifteen bales of the Delfos cotton and about thirty-five bales of Cleveland Big Boll and Wanamaker Cleveland cotton; we didn't contract that day and we reached an understanding over telephone, he being at Winnsboro and I being in Rayville, he made an offer to sell the first fifty bales of cotton picked and ginned from his plantation at twenty-one and a half cents a pound regardless of whether this cotton was Cleveland Big Boll, Wanamaker Cleveland or Delfos and irrespective of grade. I told him that I couldn't make a contract with him of that nature, unless he would personally agree that every effort would be made to pick this cotton as fast as it was opened and ginned it as fast as picked and deliver it because, if I made an open contract with him that he would tender or could tender cotton picked in any manner that he desired and I would have to take it; bought irrespective of grade. He assured me that if he sold me the cotton at twenty-one and a half cents a pound that this cotton would be picked as soon as opened, every effort would be made to preserve the grade, in order that it might be tendered as good as it possibly could be. I don't say that the verbiage used would be the exact conversation, but it's approximately the conversation that took place and his conversation to me relative to his efforts to pick the cotton in as good shape as possible that it might be tendered that way, was repeated over the telephone and I at that time had this conversation in the presence of his brother Cage McLemore, who stated that if he agrees to that—

"—I believing in and acting under the belief Mr. McLemore would use due diligence and pick this cotton as soon as it was opened and exercise the usual care and precaution in getting the crop out, I contracted with him at twenty-one and a half cents a pound for fifty thousand pounds of cotton to be delivered as specified in the contract and as we agreed, as fast as it could be picked and ginned."

There is no question but that it was understood between the parties that plaintiff was to give some personal attention to the gathering and handling of the cotton and that his agreement to do so was one of the considerations that induced defendant to contract as he did.

The cotton was sold without reference to grade or class and for that reason it was to defendant's interest to have plaintiff obligate himself to see that the cotton was picked as soon as it opened, ginned as soon as picked, and picked and handled with due and ordinary care.

Plaintiff's own testimony shows that he understood that this obligation rested upon him, for he says that on one occasion defendant called him over the telephone and told him that the cotton was not being picked and handled carefully, and that he at once went to his hands or some of them and cautioned them to be more careful.

It is defendant's contention that plaintiff failed to live up to his obligation in that respect, and that on account of plaintiff's negligence the cotton was carelessly handled, resulting in inferior grades; that he did not get the grade of cotton that he had a right to expect and which he would have gotten if plaintiff had lived up to the contract; that while it is true the sale was made without reference to grade of class, that he was entitled to the best grade of cotton which could be produced with due and ordinary care in picking and handling it.

Plaintiff does not dispute the proposition that defendant was entitled to the best grade of cotton obtainable, but his position is that he did all that was contemplated under the contract to see that the cotton was properly handled, and that he therefore lived up to his part of the contract.

As plaintiff is suing to enforce the contract, the case hinges upon that point.

In reciprocal or commutative contracts the party who wishes to have the other live up to his obligation must perform his part of the obligation and he must, furthermore, perform the contract as a whole and not in part only.

Civil Code, Article 1913.

Shreveport Cotton Oil Co. vs. Friedlander, 112 La. 1059, 36 South. 853.

Chase vs. Turner, 10 La. 19.

The rule is stated by the court in the case of Taylor vs. Almanda & Brother, 50 La. Ann. 354, 23 South. 365, as follows:

"The plaintiff who sues to enforce a commutative contract must show performance."

"A party who sues on a special contract to recover compensation alleged to be due on its performance, must show performance on his part if that matter is put at issue." 9 Cyc. 759.

The plaintiff delivered thirty-one bales of the cotton, which were accepted by defendant. He tendered the other nineteen bales, which were refused. Plaintiff alleges that he—

"* * * proceeded to have his tenants gather the cotton, using the best care and precaution possible, and that petitioner proceeded with his part of the contract."

Defendant puts this point at issue in his answer by alleging that "no care and

precaution had been exercised by the pickers" to preserve the "grades", and that the nineteen bales of cotton were refused for that reason "that they were not picked and delivered in the manner contemplated by the contract", and that "the samples drawn from each side of the bales will show evidences of the fact that no care or precaution was used in the gathering of same".

And he further alleged, in answer, that plaintiff breached the contract in that respect, which released him from it.

We have read and reread the testimony and are convinced that plaintiff gave little, if any, attention to the gathering and handling of any of the cotton.

Plaintiff was asked (page 177 of the evidence):

"Q. And you didn't go up to look after the picking of the cotton, didn't pay any attention to it, left that entirely to the tenants?

And he answered:

"Left that to the tenants, and have, ever since I had the place."

On being asked if he was a merchant, he said:

"Yes, sir; don't have time to fool with that (the picking and handling of the cotton) I just can't attend to both of it. I can't attend to the farm part of it."

He said that at one time the defendant told him that the cotton showed evidences that it was being carelessly picked and handled and registered serious complaint on that point and that he made a trip to the plantation and told the hands to be more particular; but there is no evidence that he followed up his orders or request to see that they complied. One of his tenants, named Pierce, owned a 40-acre farm of his own which he lived on and cultivated in addition to the twenty acres which he leased from plaintiff and on which seven of the nineteen bales refused by defendant were produced. Plaintiff admits that he did not at any time go to see Pierce about the gathering of this cotton. Plaintiff's own testimony shows that he practically if not entirely neglected to perform the part of the contract which required him to see that the crops were picked and handled with due and ordinary care. He attempts to excuse his failure on this point by explaining that his tenants were good men and that he felt it was unnecessary for him to keep after them. But he had assumed the obligation of seeing that they did use proper care in handling the crop and he cannot escape on that ground.

We are satisfied that the tenants did not pick and handle the crop as they should.

The testimony shows that the season of 1925 up to October 19th was most favorable for the gathering of cotton. After that date it was extremely bad on account of excessive rains and it was impossible to gather cotton so as to produce good grades after the rains set in. Of the thirty-one bales delivered prior to the rainy season there were nine bales low middling, five strict middling, thirteen middling and four strict low middling.

Mr. Colder, who bought cotton in that section during the 1925 season testified that it was unusual to find low middling cotton in a lot picked before the rains, and says—

"* * * most of the cotton at that time was running middling and better."

George Downes, another cotton buyer in that section, testified that he purchased over two thousand bales from various parties, all gathered before the rains, and

there was not a bale which graded below middling and that he did not see a sample of low middling cotton during that time, and that the thirty-one bales delivered by plaintiff prior to the rains was a "bad lot".

Hemler, the defendant, testified that the cotton showed evidences of being badly handled and for that reason showed samples below average grade for that season.

The first cotton tendered was accepted by defendant and there is no controversy as to that. We have referred to the testimony with reference to it only as tending to show loose and careless handling of plaintiff's cotton generally.

As to the nineteen bales which defendant refused to accept, they were all bad, which was to be expected as they were picked after the rains. A great deal of this is what cotton buyers call "dogs". It has no classification. Plaintiff had no right to expect cotton of good grade at that season, but he did have a right to expect the best that could be produced with due and ordinary care in picking and handling, and the testimony satisfied us that it was not handled as it could have been.

Ed. Shamblin, a cotton buyer, who examined samples of the nineteen bales said that five bales of it showed evidences of fair handling, the others bad, and that up to the time of its delivery he had not seen as bad a lot. Later on, he says he saw cotton as bad or worse but that that was probably because the longer it stays in the field after rain the worse it gets.

He further testified—

"Well, I would say that the cotton looked to me as though it was not handled very carefully."

Other witnesses thought the nineteen bales below the average, and some, including the ginner, Goforth and a tenant on his place, testified that the cotton was picked and handled in the usual and ordinary manner.

Plaintiff's tenant, Pierce, made a crop of cotton on his own land. He also leased twenty acres from plaintiff on which he produced seven bales of the nineteen bales which were refused by defendant. The testimony shows that he picked the cotton on his own land first and allowed the cotton grown on plaintiff's land to remain in the field until after the rain. He made no effort to pick any cotton grown on the leased land until after the rain but devoted all his time to gathering that on his own land. He explains that by saying that he was sick and he could not send his children away from home to pick when they had enough at home to keep them busy.

Plaintiff admits that he made no effort to get Pierce to pick and gin the cotton on his land.

The contract provided that the "seller will deliver to the buyer the first fifty (50) bales picked and ginned". The parties contemplated and the defendant had a right to expect that plaintiff's tenants would gather their cotton when it opened and would not leave it in the field subject to the ravages of the weather.

The defendant, under the letter of the contract, was to get the first fifty bales ginned. It is customary for farmers to begin picking their cotton as soon as it opens and this contract should be construed with reference to that custom. We think it would not be contended by plaintiff that if all the tenants on the plantation had done as Pierce did, that is, neglect the crop grown thereon until it suited their convenience to gather it, there would be a compliance with either the letter or spirit of the contract.

Plaintiff made no effort to get Pierce to gather the cotton that grew on his own plantation and it was not gathered until after the rains and, as stated, seven of the nineteen bales refused were Pierce's cotton.

Counsel for plaintiff argue that even if it be conceded that even if Pierce's cotton was not picked as the contract provided and as contemplated by the parties, the contract should be annulled only to the extent of that particular lot of seven bales.

We do not base our holding alone upon the fact that these seven bales were not picked and handled in accordance with the agreement, but upon the fact that not only this particular lot but all the cotton was carelessly handled and that plaintiff was at fault in not looking after it. His fault resulted in the cotton making bad samples and low grades. Whether plaintiff could have induced the tenants to pick the cotton and handle it as the contract provided and as the parties contemplated, is not the question. The facts are that he made no effort whatever to induce Pierce to pick his cotton and made but little effort to get the others to handle theirs with care, the result being that defendant was tendered a lower grade of cotton than he would have received if plaintiff had performed his part of the contract and had seen that the cotton was picked and handled with due care.

The testimony shows that the tenants on plaintiff's place knew that their cotton had been sold at 21½ cents a pound and we think the fact that they knew this accounts for their careless picking and handling it. If they had not known that the cotton was already contracted for we think it highly probable that they would have been more careful in order that they might produce a better sample.

Another feature which enters into consideration is that the contract stipulates that the cotton was to be chiefly "Cleveland Big Boll or Wanamaker Cleveland and Delfos". "Delfos" is a long staple cotton and is worth more than ordinary short staple cotton.

Defendant swore, and his testimony on that point was not disputed, that plaintiff contemplated that he would have at least fifteen bales of "Delfos". Defendant had sold him enough "Delfos" seed to plant about twenty-seven acres. In view of these facts the defendant had a right to expect a fair percentage of the long staple cotton in the lot, especially as that variety opens early, and as out of the lot of fifty bales tendered there were only two bales of "Delfos". Plaintiff excuses himself on this point by explaining that the stand was bad from the first planting and he had to replant. An answer to that is that the contract was not entered into until July 1st, long after the cotton had been planted, and plaintiff knew of that condition when he contracted and yet led defendant to believe that he would have about fifteen bales of staple cotton.

The question as to whether this contract was divisible or indivisible does not, we think, enter the consideration. The principle underlying the holding in the case which counsel cite, Shreveport Cotton Oil Co. vs. Friedlander, 112 La. 1059, 36 South. 853, is that a party cannot enforce a contract which he himself has violated. That case supports our holding in this. Plaintiff is suing to enforce a contract. The burden was upon him to show that he had performed his obligation. We do not think he has done so.

Finding no error in the judgment appealed from, the same is accordingly affirmed, with costs.