ODOM, Justice.
 

 Plaintiff acquired and was the owner of oil and gas leases on several thousand acres of land in Grant parish; all the lands covered by the leases being in what is called “wildcat territory.” He wanted a test well drilled, and to that end entered into a contract with the defendant, Lindsay, by the terms of which Lindsay agreed to drill, at his own expense, a test well to the depth of 3,009 feet, unless oil or gas was discovered at a less depth, on the S. W. corner of the S. E. % .of See. 19, T. 7 N., R. 3 W. This contract was entered into on August 8, 1933, and provided that a derrick should be erected by Lindsay and that drilling operations should begin not later than September 15, and that:
 

 “Said drilling shall continue with due and reasonable diligence until said well shall have been completed as herein stated above.”
 

 There was no specified time limit set for the completion of the well. The contract further provided that, when the surface casing was set, plaintiff would assign to defendant certain leases covering several hundred acres of land therein described, which assignment, it was provided, “ * * * shall be in full force and effect when said well has been completed as hereinabove stated, but shall be
 
 *25
 
 come mill and void if said well is not drilled and completed as hereinabove stated, as the-condition of- said leases is the drilling of a well.”
 

 By mutual consent the location of the well was changed to the S. E. % of the S. E. % of Sec. 13, T. 7 N., R. 4 W., which was covered by the Edenborn lease dated September 25, 1933. The Edenborn lease required that drilling operations be begun on or before the 1st day of October, 1933, and also required “the drilling of such well with reasonable diligence until a depth of three thousand feet is reached unless oil or gas is found at a lesser depth in paying quantities.”
 

 On November 13,1933, plaintiff assigned to defendant those leases described in the contract, and in that assignment it is stipulated that:
 

 “The said assignee agrees to faithfully carry out all the provisions of the original leases in so far as they apply to those portions or tracts therein conveyed.”
 

 Plaintiff brought this suit on July 30,1934, to set aside the drilling contract entered into by him and defendant on August 8, 1933, and also to set aside the assignment of the leases made on November 13 following, on the ground that, whereas defendant had erected a derrick on the land and had “commenced said operations on said well at approximately the time agreed upon,” he had failed to perform that part of his agreement which required him to continue drilling with due and reasonable diligence until the well was completed.
 

 Defendant excepted to the petition on the ground that it set out no cause of action, which exception was overruled. He then answered, admitting that drilling operations had been delayed, but alleged that the delays were due to no fault of his, and, while the well was not completed when the suit wa« filed, yet he had drilled to a depth of 2,363 feet, and that he continued operations on the well up to a few days prior to the filing of the suit, and set up the following special defenses:
 

 “Defendant shows that plaintiff herein condoned, ratified and acquiesced in the delays he now complains of,” and that he was not put in default prior to the institution of the suit.
 

 There was judgment for plaintiff as prayed for, and defendant appealed.
 

 According to our view, plaintiff’s own testimony shows that this judgment should be reversed. He' testified that drilling operations were begun substantially at the time specified, but that defendant defaulted on his contract, in that he did not continue drilling operations with due and ordinary diligence. He says that the well could have been drilled to completion within 40 days, but that it was not completed at the time this suit was filed on July 30, 1934, about 10 months after drilling was begun. He admits, however, that, whereas the contract provided that he should assign to defendant certain leases, which was the consideration for the defendant’s drilling the well in this wildcat territory, and that this assignment should have been made at the time drilling operations were begun, yet he did not make these assignments until nearly 2 months later. Defendant contends and explains to our satisfaction why this de
 
 *27
 
 lay on plaintiff’s part retarded operations for almost 2 months.
 

 Defendant testified that plaintiff knew he had no ready cash with which to prosecute the drilling operations, and that it was necessary that he sell acreage within the block in order to raise money, and that he, of course, could not sell acreage until the leases were assigned to him. Plaintiff admits that he knew defendant absented himself from the well on different occasions for the purpose of raising funds, and admits that some of the delays were due to that cause.
 

 Plaintiff testified also that he was on the scene of operations almost every day from the time drilling was begun in September, 1988, to April 18, 1934, and that at various and sundry times he personally had charge of, and directed, operations. He specified dates on which no work was done and told the reasons why. Asked how he gained this information, he said, “From personal observations.” He testified from notes, and was asked who prepared them, and he said he did. He said, “I kept this record myself, daily.” Counsel for defendant then said to him", “Therefore, you were on the job at all times?” and be said, “Yes, sir, I was on that platform every day, up to April 18, when there was any work going on.”
 

 Plaintiff testified at great length and in detail concerning the delays and the cause of them. He says be watched operations from day to day while the well was going down to a depth of 2,363 feet, and further that defendant paid all the expenses of drilling.. He says that nothing was done on the well after April 18, but he evidently meant that the well was made no deeper after that date, because the testimony shows beyond question that the drill stem broke about that time, that the crew was unable to extract it, and that on May 7 plaintiff went to Shreveport and employed an expert named Poster, at defendant’s expense, to go to the well and supervise the extraction of the drill stem, and Poster and others testified that they worked at the well until about July 4, and stayed there until July 12 awaiting orders. In the meantime plaintiff went to Urania, La., to get prices on piping for the well and got prices from dealers in Shreveport also.
 

 In the early part of July, 1934, defendant was convicted in a Texas court for using the mails to defraud, and was sent to a federal prison in Oklahoma. He left his affairs in charge of his wife, who, to the knowledge of plaintiff, made efforts to raise money with which to complete the well. Plaintiff admits that on July 11 Mrs. Lindsay introduced to him a man named Martin, who claimed to represent an Oklahoma oil corporation, and that Martin told him his corporation would advance to Mrs. Lindsay sufficient funds to complete the well. Plaintiff says he investigated and found that there was no such corporation as Martin said he represented.
 

 On July 12 plaintiff wrote defendant’s wife as follows:
 

 “Dear Mrs. Lindsay: Since you left, I have written some parties in Colfax, that I would be down there in a short time, to see that this well is properly drilled and completed, also drill another well, providing the leases can be reinstated in good shape, and for them to let me know at once just what can be done.
 

 
 *29
 
 “Please do not fail to send the assignment to L. L. immediately and ask him to return to you as quick as possible.
 

 “Hope you are successful in raising some money quick so I can get down there and straighten things out and get the leases fixed up as they should be.
 

 “Must get rid of the nite crew and Pool as soon as possible and then proceed very carefully in every way.
 

 “Please keep me posted daily by wire or letter what to expect. I feel there is an oil field there and it is my desire that you be protected in every way possible.
 

 “Yours most respectfully,
 

 “[Signed] H. H. Temple.”
 

 The witness Poster testified that plaintiff was at the well doing some work as late as June 29. Jeff Smith said he worked at the well from June 8 to July 12 and that he saw plaintiff at the well twice during that time.
 

 The defendant was in prison at the time the case was tried on September 26, and for that reason could not be present. But it was agreed by counsel on both sides that he be permitted to make a detailed statement under oath before an officer authorized to use a seal, and that his statement might be offered in evidence without objection, except as to the irrelevant portions, and that, if present, he would testify according to the statement made. The statement was offered and filed. It is quite lengthy, but in sum he says that plaintiff was present all along, knew that it was necessary for him to sell acreage to get money, encouraged him to proceed, and seemed well pleased with the operations; that plaintiff knew of all the hardships he was undergoing, and never at any time indicated that he expected to sue to cancel the contract and the assignments. Defendant’s wife gave similar testimony.
 

 By July 12 defendant had become indebted to laborers to the extent of about $900, and fourteen of them filed suits and had the well and the lease provisionally seized. These claims had not been paid at the time the case was tried on September 26, but defendant’s wife testified that she had arranged not only to pay these claims but to complete the well, and that the man who would furnish the funds was then present in court. She offered to call him to verify her statement, but on objection by counsel for plaintiff this testimony was excluded.
 

 The testimony further shows that defendant had drilled the well into a sand formation which an expert said might prove, on examination, to be “oil bearing sand.” It is further shown that it was generally expected that an oil well might be brought in at any time.
 

 The established facts, therefore, are that drilling operations were begun on time and that there was no definite time expressed either in the drilling contract between plaintiff and defendant or in the Edenborn lease for the completion of the well, each providing tnat drilling operations should be prosecuted with due and reasonable diligence; that drilling operations were frequently interrupted and delayed over a period of some 10 months, much longer than would have been necessary to complete the well had the drilling been carried on continuously; that part of the delay was due to plaintiff’s failure to assign the leases to defendant on time; that plaintiff was personally present at the well
 
 *31
 
 during the entire time up to April 18, 1934, and was at the well at intervals from April to July, and at times took part in the operations ; that plaintiff knew that defendant had never at any time intentionally or actually abandoned operations; and that work at the well had continued up to July and he knew that as late as July 11 defendant’s wife was making efforts to continue operations and on July 12 wrote her, stating, among other things, that he hoped she was “successful in raising some money quick, so I can get down there and straighten things out and get the leases fixed up as they should be,” and “I feel that there is an oil field there and it is my desire that you be protected in every way possible”; that the well was drilled to a depth of 2,363 feet; and that defendant paid all expenses.
 

 Eighteen days after plaintiff wrote defendant’s wife the above-quoted letter, he filed this suit to cancel the drilling contract without giving defendant or his wife the slightest intimation that he intended to do so.
 

 Under these circumstances plaintiff cannot recover. There was no active breach of the drilling contract by the defendant, who from the time the well was begun in September, 1933, to July 12, 1934, was constantly making efforts to prosecute the work, and this to the knowledge of plaintiff. There were delays from time to time due to various causes, but defendant never ceased activities. Plaintiff not only knew of these delays, but knew the reasons for them as well, and, while he says these delays were unreasonable, the fact remains that he witnessed and condoned them and to the very last encouraged defendant to continue operations. Plaintiff’s words and deeds lulled defendant into a sense of safety and security, and he had no right to take snap judgment as he did and sue for a dissolution of the contract. He should have put defendant in default and given him additional and sufficient time to perform. To permit him to annul this contract without putting defendant in default under the circumstances would be unfair and inequitable. The law deprecates the taking of snap judgment in cases of this kind and compels the obligee to give his obligor fair warning if he intends to dissolve the contract.
 

 “A resolutory condition is implied in all comutative contracts, to take effect, in case either of the parties do not comply with his engagements; in this case the contract is not dissolved of right; the party complaining of a breach of the contract may either sue for its dissolution, with damages, or, if the circumstances of the case permit, demand a specific performance.” Civ. Code, art. 2046.
 

 But in contracts or agreements by the terms of which one person obligates himself to do something for another, as in this case, the obligee cannot demand .a dissolution of the contract unless the obligor is in some way put in default. Article 2047 of the Civil Code reads as follows:
 

 “In all cases the dissolution of a contract, may be demanded by suit or by exception; and when the resolutory condition is an event, not depending on the will of either party, the contract is dissolved of right; but, in other cases, it must be sued for, and the party in default may, according to circumstances, have a further time allowed for the performance of the condition.”
 

 
 *33
 
 The resolutory condition in this case did not arise from “an event, not depending upon the will of either party,” and therefore the contract was not “dissolved of right.” But a resolutory condition was implied in the contract, and the Code provides that, in cases where the contract is not ’dissolved of right, its dissolution “must be sued for, and the party in default may, according to the circumstances, have further time allowed for the performance of the condition.” So a default on the part of the obligor is a condition precedent to a suit for its dissolution.
 

 An obligor is put in default in either one of three ways, one of which is:
 

 «* * * By the terms of the contract, when it specially provides that the party, failing to comply, shall be deemed to be in default by the mere act of his failure.” Civ. Code, art. 1911.
 

 Defendant was not put in default by the terms of the contract. It contains no default clause. There was no time limit set within which the well was to be completed, and, while the contract stipulated that, after the easing was set, “drilling shall continue with due and reasonable diligence until said well shall have been completed as herein stated above,” it is not stated when it was expected that the well would be finished. So far as a definite time to do anything was concerned, all that the contract required was that the well be “spudded in and surface casings set on or before September 15, 1933,” which was fulfilled.
 

 In the contract between these parties, it was specified that, when the casing was set, plaintiff should assign to defendant certain described leases to be put in escrow in a designated bank to be delivered to defendant “when he has complied with the requirements herein contained
 
 to the effect of setting surface casings,
 
 and should he fail to comply with said requirements, said assignments shall be returned to the party of the first part by the bank.” (Italics are the writer’s.)
 

 By the terms of article 1911 of the Civil Code, a debtor or obligor may also be put in default “by the act of the party [the obligee], when at or after the time stipulated for the performance, he demands that it shall be carried into effect,” and “by the operation of law. This takes place in cases where the breach of the contract alone is by law declared to be equivalent to a default.”
 

 An obligor may put himself in default by actively doing something inconsistent with the obligation which he has assumed, and where there is such active violation, no putting in default is necessary. Civ. Code, arts. 1931, 1932. But it is not alleged, nor is it contended, that defendant actively breached the contract, thereby putting himself in default.
 

 Counsel argued at the bar, and they say in their brief, that it was not necessary that plaintiff put defendant in default as a condition precedent to the action to dissolve the contract in this case, which is equivalent to saying that defendant had been put in default in some way provided by law, or had put himself in default at the time suit was filed, because a putting in default in some way was unquestionably necessary. So that, if defendant was ever put in default, it was either by the “term of the contract” or “by operation of law.” Civ. Code, art, 1911.
 

 
 *35
 
 This contract specifies no definite “term,” which, as applied to contracts, means the “time given or limited for the performance of an obligation.” Civ. Code, art 2048. Defendant was therefore not put in default by the term of the contract, as we have said. Therefore he must have been put in default, if at all, “by operation of law,” which takes place, according to the Oivil Code (article 1911), “in cases where the breach of the contract alone is by law declared to be equivalent to a default.”
 

 Where one obligates himself to do something, not within a definite time, but within a reasonable time, or to prosecute work to completion “with due and reasonable diligence,” the question whether the work was done within a reasonable time or whether the contract was prosecuted with reasonable diligence is not one of law, but of fact necessarily, depending upon conditions and circumstances. An obligee has no right to declare his obligor in default merely because in his opinion the contract was not performed with due diligence or within a reasonable time. This defendant was not put in default by operation of the law, and, as plaintiff did not put him in default, and as he did not put himself in default, he was never put in default, at all.
 

 If defendant was guilty of any breach of the contract at all, it was no more than a passive breach of it, and in such cases a putting in default is a condition precedent' to a recovery either for damages or in a suit for dissolution. Civ. Code, arts. 1931-1933; Darragh v. Vicknair, 127 La. 171, 52 So. 264.
 

 Under the circumstances here disclosed ' and under the law and jurisprudence, plaintiff, before suing to have the contract declared forfeited, should have made demand on defendant to complete his contract and should have given him reasonable time within which to do so. This view is in accord with that which we have expressed 'before in the following eases: Watson v. Feibel, 139 La. 375, 71 So. 585; Pipes v. Payne, 156 La. 791, 101 So. 144; Caldwell v. Alton Oil Co., 161 La. 139, 108 So. 314; Doiron v. Oil Co., 172 La. 553, 134 So. 742.
 

 For the reasons assigned, plaintiff’s de* mands are rejected and his suit is dismissed as in case of nonsuit, with reservation of his right to renew his demand after putting defendant in default and giving him reasonable time to perform; all costs to be paid by appellee.
 

 BRUNOT, J., dissents.