GENERAL AMERICAN LIFE INS. CO. v. NATCHITOCHES OIL MILL, Inc.

Civ. A. No. 1034.

District Court, W. D. Louisiana, Shreveport Division.

March 13, 1946.

T. W. Holloman and Harold W. Hill, both of Alexandria, La., for plaintiff.

Stafford & Pitts, of Alexandria, La., for defendant.

PORTERIE, District Judge.

Though this case has been submitted in full and on its merits, it is our duty first to consider the motion to dismiss filed by the defendant on the ground that the petition fails to state a claim upon which relief can be granted. The motion to dismiss was fully presented orally, and at that time an amended complaint was permitted by the Court to be filed showing that plaintiff completed the sale of the remaining portion of Brookwater Plantation on January 22, 1944 (the original complaint gave no date), then briefs were submitted. In disposing of the motion to dismiss, we said that the "Ruling on the motion to dismiss filed by the defendant is postponed until the case be heard on the merits * * *". The record of the case at the beginning of trial will show the statement that we should consider the motion now as for then, free of the evidence on the trial on the merits.

Accordingly, we shall now proceed and pass on the motion to dismiss.

Plaintiff demands the specific performance of a contract to buy and sell real estate.

On April 28, 1943, the defendant agreed to buy a gin and gin site from the plaintiff at the price of $30,000 in cash, but the following paragraphs formed a part of what was denominated a "sales agreement":

"It is understood and stipulated by and between the parties hereto that this sale and purchase is contingent upon a sale of the remainder of the Brookwater Plantation by the insurance company to Gilbert K. Alford, agent and other assignees of his, who are presently in the process of purchasing the said plantation with a loan from the United States acting through the Farm Security Administration of the Department of Agriculture. It is especially stipulated and agreed between the parties that in the event the sale of the remainder of the Brookwater Plantation to Gilbert K. Alford and his assignees should not be consummated for any reason forever,[1] then this agreement by and between the Natchitoches Oil Mill, Inc., and the Insurance Company shall be null and void.

"It is further agreed that in the event the sale of the remainder of the Brookwater Plantation to Gilbert K. Alford and his assignees is not consummated on or before noon on November 1, 1943, then and in that event the Natchitoches Oil Mill shall have the right, at its option, to cancel and avoid this contract and agreement; or the said oil mill may, if it so desire, extend this agreement for an additional six months without the payment of any consideration."

Then after two paragraphs which are unimportant here, there is another condition precedent in the contract: "It is agreed and understood between the parties hereto that this agreement to buy and sell is conditioned upon the execution by Gilbert K. Alford and his various assignees covering portions of the Brookwater Plantation of written agreements binding and obligating the said Gilbert K. Alford and his various assignees to gin the cotton produced on the Brookwater Plantation with the Natchitoches Oil Mill for a period of five years, provided that the cost of ginning and the services rendered and the prices for seed paid shall be those prevailing in the community. If Gilbert K. Alford and ninety per cent of his assignees who are tenant purchasers of the Brookwater Plantation do not sign and execute the said agreements within a period of sixty days then, and in that event this agreement shall be null and void and the Natchitoches Oil Mill will no longer be bound to purchase said gin from the General American Life Insurance Company."

In the consideration of the motion to dismiss, we shall not consider the condition contained in the last paragraph above. This point was not presented or reached on the motion to dismiss and, accordingly, the issue to interpret is contained in the second paragraph of the first-quoted language.

It is mutually and definitely conceded that on November 1, 1943, the remainder of Brookwater Plantation had not been sold to Alford or his assignees. " * * * then and in that event the defendant had the right * * * to cancel and avoid * * *; or extend this agreement for an additional six months". To do either was totally at the defendant's discretion.

---

[1] All parties agreed "whatever" for "forever."

The defendant remained silent on the cancellation and avoidance as well as on the extension of the agreement. It follows logically that a desire to extend for six months had to have written expression—and that is so whether it be legally required or not. It follows that if the extension for six months had to be in writing to be valid at law, if there be no evidence of writing on this point of extension, then the situation is that the obligation to buy was canceled and voided.

Our view of the paragraph is that it really reads " * * * is not consummated on or before noon on November 1, 1943, then and in that event the Natchitoches Oil Mill shall have the right, at its option, to cancel and avoid * * *; or * * * (to) extend this agreement for an additional six months without the payment of any consideration."

Plaintiff's position is that the defendant had to formally cancel the contract by letter or by some form of notice, or even goes so far as to indicate by suit on November 1st or soon thereafter, that since nothing in writing was put out and nothing in the way of a suit was filed by the defendant, the condition precedent of the sale of the remainder of Brookwater Plantation to Alford and his assignees disappeared, and that the silence of the defendant after November 1st was an extension of the agreement for an additional six months. Six months from November 1st would run the date to May 1, 1944; as aforestated Brookwater Plantation did not pass to Alford and his assignees until January 22, 1944, and the tender was not made before January 24, 1944. (Supplemental complaint.) The warranty deed which was tendered on January 24, 1944, by plaintiff to defendant was dated the 14th of January, 1944, at St. Louis, Missouri.

Defendant's position is that we are dealing with immovable property and all agreements therewith must be in writing, and that parol testimony is inadmissible, Civ. Code Art. 2275; that if there was to be an extension it had to be in writing; otherwise there is none.

Further, that the burden of effecting the sale of the remainder of Brookwater Plantation to Alford or his assignees was a condition precedent of deep significance to the defendant and the plaintiff did not unburden itself of that obligation, though it had from April 28th, the date of contract, to the date of the agreement to sell and buy, to-wit November 1st; that under the law it did not have to write about cancellation and avoidance or to file suit.

"Every transfer of immovable property must be in writing; * * *" says Article 2275 of our Civil Code. "Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, *or since*" (italics ours), says Article 2276 of the Civil Code.

The headnote in the case of Oeschner v. Keller, 134 La. 1098, 64 So. 921, is: "A promise to sell real estate must be vested with the same formalities as are prescribed for sales of real estate. It must be in writing. Civil Code, arts. 2440, [2402], 2462, 2275; Act No. 249 of 1910, p. 417."

In the case of Conklin v. Caffall, 189 La. 301, 179 So. 434, at page 437, we have: "On the trial of the case Conklin offered to testify that the reason why he did not comply with the conditions of the instrument dated February 3, 1933, within the three years stipulated was that Caffall verbally consented to extend the time for complying with the conditions. This testimony was objected to on the ground, stated in article 2276 of the Revised Civil Code, that parol evidence is not admissible against or beyond what is contained in a written contract, nor as to what may have been said by the parties before or at the time of making the contract, or since. This rule of evidence does not forbid the proof of a subsequent verbal agreement, modifying or even abrogating a written contract, if the contract or agreement is one which is not required to be in writing. Salley v. Louviere, 183 La. 92, 162 So. 811. But a contract to transfer immovable property must be in writing. Rev.Civ.Code, art. 2275. And, according to article 2462 of the Revised Civil Code, as amended by Act No. 27 of 1920, p. 28, a promise or option to sell real estate is not valid unless given in writing. Hence an extension of the time stipulated in a written promise or option to buy or sell real estate must be in writing. And it has been decided that the acceptance of an option for the purchase of real estate must be made in writing and tendered to the proposer before the expiration of the time stipulated in the option. Barchus v. Johnson, 151 La. 985, 92 So. 566."

We admit that Article 2462 says:

820

"A promise to sell, when there exists a reciprocal consent of both parties as to the thing, the price and terms, and which, if it relates to immovables, is in writing, so far amounts to a sale, as to give either party the right to enforce specific performance of same.

"One may purchase the right, or option to accept or reject, within a stipulated time, an offer or promise to sell, after the purchase of such option, for any consideration therein stipulated, such offer, or promise can not be withdrawn before the time agreed upon; and should it be accepted within the time stipulated, the contract or agreement to sell, evidenced by such promise and acceptance, may be specifically enforced by either party."

■ Therefore, specific performance can not be had by plaintiff in the instant case, because the condition precedent, the burden of the plaintiff, was never fulfilled in time by the plaintiff.

By amended bill of complaint filed November 7, 1944, previously to our considering the motion to dismiss November 9, 1944, the plaintiff admitted that the remaining portion of Brookwater Plantation was not sold to Alford or assignees before January 22, 1944, and that:

" * * * on frequent occasions after November 1, 1943, defendant, through its President, C. L. Hayne, evinced a desire to purchase said property described in the original complaint herein and particularly on or about December 15, 1943, when plaintiff tendered to defendant a form of deed for defendant's approval as to form, which said form of deed, under instructions from the said C. L. Hayne, was submitted to defendant's then counsel, Hon. Arthur C. Watson, Natchitoches, Louisiana, who, at defendant's request, examined said proposed form deed, and returned it approved to plaintiff's agent, Mr. J. F. Hayden, by letter dated December 16, 1943, a copy of which is attached and marked Plaintiff's Exhibit 'C'.

"That on January 22, 1944, plaintiff tendered to defendant, a warranty deed and was advised by defendant's president that January 22nd being Saturday, that he would like the matter carried over until Monday, January 24th; that on January 24th, defendant's president advised plaintiff's agent that he would like to discuss the deed with his attorney, the said Arthur C. Watson, and at defendant's request, plain-

tiff's agent met with defendant's president in the office of the said Watson at Natchitoches, Louisiana, on Tuesday, January 25th, at which time defendant refused to accept said deed, such refusal being allegedly based upon the alleged failure of plaintiff to obtain agreements from tenant purchasers to gin their cotton at Brookwater Gin for a period of five years, although defendant's president had acknowledged by authentic act, that said provision of said contract·has been complied with, as is shown by a copy of said authentic act which is hereto attached and marked Plaintiff's Exhibit 'D'."

The first admission puts the condition precedent complied with only by January 22, 1944, instead of November 1, 1943, and nowhere in the record is there written evidence by the defendant of an extension of time beyond November 1st.

Next, the letter of lawyer Watson of December 16, 1943, is not an extension of time—there is no mention of extension; it is not of such a character as to have the dignity of a written extension of time. It is not of parity with the notarial act of the sales agreement. It is not compliance by plaintiff under its agreement of April 23, 1943, for the furnishing of sales of the Brookwater Plantation to Alford or assignees, by November 1, 1943.

It acknowledges the receipt of "copies of proposed deed", and says further: "The general form of the deed and attached resolution meet with my approval." The rest refers to the fact that there is no necessity for him to check the description, or to go into the title, since there is to be an insurance of title furnished. The letter ends: "I am sending a copy of this letter to Mr. Hayne for his information."

In the face of the strict articles of the Code previously quoted, and the jurisprudence discussed below, how can this letter be construed as an extension of time in writing of the contract for six months?

The defendant, through Mr. Hayne, and the plaintiff, through its local representative, Mr. Hayden, might have had further discussion after November 1, 1943, because there was no law forbidding them to make a new deal about the gin. What reasons were given by the President of the defendant company not to accept the tender of January 22, 1944, is immaterial in the face of the legal requirements as to writing.

It is immaterial when passing on the motion to dismiss, whether or not there had been a failure of plaintiff "to obtain agreements from tenant purchasers to gin their cotton at Brookwater gin for a period of five years."

We have read the list of numerous and varied cases found under the heading "Parol Evidence Inadmissible—Miscellaneous Cases" at page 1273, Dart's Louisiana Civil Code, 2d Edition, Vol. 1, under Article 2276 of the Civil Code.

Out of that number, we have selected the following quotations of law, which we felt directed us in our conclusions in this case:

"This is not, as the appellees call it, a mere technical objection; it is one of great import and much substance; its object is to preserve inviolate one of the most sacred rules of our law; a rule which, in matters of public acts, is not made *merely for the safety of the contracting parties,* but also for that of third persons, whose safety may be affected by such acts." Clark's Executors v. Farrar, 3 Mart., O.S., 247, 248, at page 254. (Italics ours.)

" * * * thus a mass of irrelevant testimony has been admitted under the loose and improper practice too prevalent in our courts, of receiving any evidence offered, subject to all legal exceptions." Lynch v. Burr, 7 Rob. 96, 97, at page 100.

The last above paragraph described correctly what we have done very likely in this case.

"If the agreement be considered as a stipulation to pay an additional price for the land, the plaintiff and appellant is equally without a remedy; it makes no part of the written contract between parties, and parol evidence cannot be received in its support. This point was settled in Clark's Ex'rs v. Farrar, 3 Mart. [O.S., 247], 252, 253." Hart v. Clark's Ex'rs, 5 Mart., O.S., 614, at page 615.

"The unbending jurisprudence of this State does not allow a party to vary or destroy his own voluntary declarations or written agreements by anything short of written evidence." Headnote in Cary v. Richardson, 35 La.Ann. 505.

The act at issue here is an authentic act (notary and two witnesses, Art. 2234). Read Arts. 2440 and 2276 to be impressed of the necessity of an authentic act and as the peak of proof on the point we offer Art. 2236: "The authentic act is full proof of the agreement contained in it, against the contracting parties and their heirs or assigns, unless it be declared and proved a forgery."

■ The contract by authentic act here is one affecting real estate and it is free of ambiguities—the greater reason that it may not be modified by oral testimony. Art. 2276, C.C. Roe v. Maniscalco, 174 La. 526, 141 So. 49.

This is sufficient to dismiss the plaintiff's case.

■ Moreover and additionally, this is a commutative contract "in which what is * * * given * * * by one party, is considered as equivalent to, or a consideration for what is * * * given * * * by the other." Article 1768 of the Civil Code.

The plaintiff is seeking to enforce specific performance thereunder.

"As a general rule, a person who sues to recover on a commutative contract must allege and prove that he has performed his part of the contract, C.C. art. 1913; McLemore v. Hemler, 4 La.App. 388." Merrill v. Harang, La.App., 198 So. 386, at page 387.

At page 390 of 4 La.App. in McLemore v. Hemler, supra, we have:

"In reciprocal or commutative contracts the party who wishes to have the other live up to his obligation must perform his part of the obligation and he must, furthermore, perform the contract as a whole and not in part only.

"Civil Code, Article 1913.

"Shreveport Cotton Oil Co. v. Friedlander, 112 La. 1059, 36 So. 853.

"Chase v. Turner, 10 La. 19.

"The rule is stated by the court in the case of Taylor v. Almanda & Brother, 50 La.Ann. [351], 354, 23 So. 365, as follows:

" 'The plaintiff who sues to enforce a commutative contract must show performance.'

" 'A party who sues on a special contract to recover compensation alleged to be due on its performance, must show performance on his part if that matter is put at issue.' 9 Cyc. 759."

Accordingly, plaintiff must show compliance with its obligations of the contract to remain in court. The plaintiff is strong about pointing to the defendant and contending that it should have done this or

should have done that, when, in truth, it was the plaintiff who was not complying with its obligations. Why should the defendant ever have put the plaintiff in default? The plaintiff by its own acts was defaulting under the contract.

Accordingly, the motion to dismiss for this additional reason has to be again sustained.

As this case is likely to be appealed, we shall proceed and consider the whole case. What is the additional story brought in by the full trial?

The plaintiff herein, on April 6, 1943, being the holder of a large acreage of land in the Parish of Concordia, gave an option of sale to Gilbert K. Alford, agent, wherein the cash consideration was $137,500; Alford and a number of assignees were to borrow money under Title 1 of the Bankhead-Jones Farm Tenant Act, 7 U.S.C.A. § 1001 et seq., in that exact amount. The defendant fit well into this picture because it came and took the gin and gin site for $30,000—an item (not farm land) that presumably did not fit in the scheme to secure this sum from the Government. And so it was arranged that Hayne would take the gin and gin site for $30,000, as per the contract previously described, where the defendant's main incentive, of course, was to get the cotton from these various owners to its mill to gin. The plaintiff did receive the $107,500.

We can not join plaintiff and say that time was not of the essence. Fully meaningful dates are specified: November 1st or six months therefrom—the latter extension to May 1st is purely at the will of defendant. So much for the original and main agreement.

As to the ancillary but concomitant agreement—the lease of the gin—there is the specific date for the end of the lease: December 31, 1943; not only in the original contract but reiterated in the letter from plaintiff to defendant dated August 13, 1943, Plaintiff Exhibit F.

And why should not time be of the essence? It is always a persistent factor in all human relations. The defendant corporation is interested in the ginning of cotton, because then it gets the seed (as payment for ginning) from which the oil is made—its main business is to produce cotton-seed oil. The ginning season begins about the latter part of August and runs in full force during September and October —and is through by December 1st even in the alluvial areas.

Consequently, as a practical thing, the cotton gin should be in full use for the calendar year in one person.

The fact that concurrently (on the same date) with the agreement of the sale and purchase agreement, the gin was rented until December 31, 1943, gives full support of the definite significance of November 1, 1943, as a date, for if the condition precedent were or were not fulfilled, the gin got clearly into the ownership of either the plaintiff or the defendant. The good faith of the contractants was symbolized properly by the lease for the whole year to the prospective owner.

■ The leasing of the gin is no significance that the defendant meant to extend the contract six months in the case plaintiff defaulted—it was executed on the same date as the sales agreement.

The gin lease was totally dissociated, and with care, from the sales agreement— for time was of the essence. Alford and his assignees were not to obtain possession until December 31, 1943; nor was the defendant, even if the November 1st burden of plaintiff were fulfilled in time, so defendant paid $1,500 for immediate possession and use of the gin for 1943. The defendant would gin the crop of 1943 and that's all. The amount of $1,500 was not to be deducted from the purchase price of $30,000.

The plaintiff, seller to Alford and assignees (these are to receive from Uncle Sam $107,500 to turn over to the plaintiff), is the owner of land and gin and gin site until December 31, 1943.

Note the following careful language of dissociation of the two contracts in this paragraph of the letter of August 13, 1943, from the plaintiff to the defendant: "It is further understood that if for any reason the sale of the Plantation to Gilbert K. Alford and his assignees is not completed and the sale to you of the gin and gin site is not completed, your right to possession of the gin and gin site and other property will cease at the end of the present ginning season, and in no event later than December 31, 1943."

Plaintiff would have their full entity, cotton land and cotton gin, for the future.

The paragraph of the agreement, aforequoted, providing for the ginning contracts

stipulates a material condition of great interest to the defendant—the object is cotton to be ginned by the gin for which $30,000 is being paid—not a paltry sum.

Admitting the premise of the plaintiff, only pro arguendo, that the silence and the actions of defendant have tacitly extended the commutative contract to May 1st, does not this ginning promise remain constant until May 1st? What was the status of this obligation in January of 1944? The original purchasers were mere figureheads. Plaintiff knew this. Did it not deliver them through its agent, Hayden, to the defendant? The defendant had the right to refuse the bargain on January 22, 1944, if it be extent (for the sake of argument) for the violation of the above promise, an essential condition to the original sales agreement of April 23, 1943. For this singly sufficient reason, the case of plaintiff falls.

The parties kept nibbling with each other after November 1, 1943, as a matter of course. Hayne likes gins; the plaintiff insurance company does not like to operate or lease cotton gins—it wants and likes cash.

Little by little, from time to time, after the original set of ginning contracts had been delivered in June, 1943, by Mrs. Evans, secretary to Mr. Hayden, agent of the plaintiff, Hayne discovered how unsubstantial and fictional was the assurance to defendant of its ginning the cotton produced on Brookwater.

It stands to reason from Hayne's viewpoint (looking for cotton-ginning obligations) that he expected the sales by General American would be to the thirty-seven signers of the ginning contracts. In fact, that is the contract. What did happen? When the plaintiff sold to the thirty-seven tenants as late as January 22, 1944 (when it had promised to do so by November 1, 1943) there were only seventeen of that number from whom defendant had a ginning contract. The defendant was 54% short on what had been promised it.

The original ginning contracts were purely personal with the original signers; when the original signer of the ginning contract issued a power of attorney to the Regional Director of the Farm Security Administration to sell to another, the other was free to gin wherever he wished.

Cotton ginning in the south is highly competitive; oil-mills set themselves off geographically as actively as do adjacent owners of oil-producing lands.

Hayne had been beguiled; plaintiff knew that; Mr. Hayden, the local representative of plaintiff, sent the supposed valid ginning contracts plus the receipt for them to Hayne for signature. Hayne lives at Alexandria, 30 or 40 miles from Brookwater, and did not know the real situation.

We shall recite a few of the impositions on Hayne. Mr. Hayne, when he executed a receipt for the ginning contracts of thirty-seven parties, did not know for sure that actually at the time none was the owner of the property in view, but expected rightfully under the agreement, that all these signers would be before he accepted the gin and gin site. Actually only seventeen did ever get on the farming land.

Mr. Hayne was shown by Mr. Hayden the implements that were supposed to stay on the plantation. The remark was that all these tractors and old equipment, caterpillars, etc., on the place would be used by the "tenant farmers who plow this fall. Everything stays here for the benefit of the tenant farmers."

Hayne thought surely that the tenants would receive them free, or else they would be sold on terms. Others but the tenants bought the agricultural equipment and this was at a time when Hayne and Mr. Hayden were talking about the gin and gin site. Mr. Hayne told Mr. Hayden that he would not take the property, and that was after November 1st when he found the tenant farmers were not on the property. This was several days before he categorically refused the tender.

There is a final dramatic climax to this business drama. When Mr. Hayne testified in chief as a defendant, he brought out a conversation that had occurred beginning at his office at Alexandria on Saturday morning before the tender on Monday, the substance of which was that Hayden told him that a $10,000 profit could be made by resale of the gin and gin site for $40,000 to the Southern Oil Company. Mr. Hayden told him that he had gone to Vidalia, had met Mr. Sam Hart and Mr. Klopp, local employee and manager of the Southern Oil Mills, respectively, and that a deal was set and ready to be closed; all that was needed was that Mr. Klopp was to go back to New Orleans to get the approval of his superiors and that Klopp would be back the following Wednesday to close the deal, enabling Hayne to make a profit of $10,000.

After this discussion, Hayne says Hayden presented him the deed to sign. Hayne says he wasn't any too sure, and told Mr. Hayden for him to make the profit. Mr. Hayden said the man would come back the following Wednesday and Hayne replied, "Let's just put it off until next week."

After Mr. Hayden left, Mr. Hayne says he put in a call for Mr. Klopp in New Orleans, with the Southern Oil Company, and that he failed to get Mr. Klopp on Saturday afternoon and all of the day Sunday, but that on the Monday morning, when Mr. Hayden had come back with the deed and offered it for signature, during the very interview, Hayne's secretary had Klopp on the long distance phone, and he took the phone call in the back office. The result of the conversation with Klopp was that Klopp did not know Mr. Hayden, he had not met Mr. Hayden the previous Wednesday with Mr. Hart and another gentleman, and knew nothing about an offer of $40,000 with the Southern Cotton Oil Company for the gin. In fact, Mr. Klopp said, "I would not pay $40,000 for that gin or any other gin."

On cross-examination Mr. Hayne repeated the story, and in answer to the following question: "If he was going to sell it to Klopp, what did that have to do with the sale to you?" he replied: "Do you want me to tell you exactly what I think about the whole thing? Mr. Hayden had not sold it to Klopp. He had not even met Klopp. He simply made all of this story up with the hope of inducing me to go ahead and sign the deed, and then I would be left with the bag to hold. In other words, he was putting up this false story to me about being able to make ten thousand dollars profit immediately on this proposition in order to get me to go ahead and carry out a proposition that was already dead, and that he knew that I knew was dead, and that he knew I knew I was not going to do. Now you have asked me and I have let you have it. That was his sole purpose. That ten thousand dollars was nothing more or less than a come on to get me to sign up right quick, and if I had fallen for the fake and had taken it then he would have had some other story about the ten thousand dollars not materializing. The ten thousand dollars was something made up in his mind in order to get me to sign the deed. He had never met Mr. Klopp, and Mr. Klopp had never made him any such proposition, and he knew it."

Nothing like the above had been brought out on either direct or cross-examination of Mr. Hayden as a witness for plaintiff, but, in rebuttal the exact words of Mr. Hayden on this episode were these:

"About a week or ten days before the tender of the deed to Mr. Hayne on January 24th I had occasion to make a trip to Ferriday. I stopped at the Brookwater Store and had a talk with Mr. Price Douglas, who was manager for the Brookwater Plantation, and an employee of the General American Life Insurance Company, and he told me * * * that he had had a meeting with a Mr. Hart, a representative of the Southern Cotton Oil Company, and that Mr. Hart told him that the Southern Cotton Oil Company would be interested in buying the gin, and Mr. Douglas asked me if I thought that Mr. Hayne would sell the gin. I told him I did not know, that I would take the matter up with Mr. Hayne. I then asked Mr. Douglas what price he thought he could get from the Southern Cotton Oil Company. He stated to me that he thought that they might get a thirty-five thousand dollar price. I told him that I would see Mr. Hayne and would call him, Mr. Douglas, the next morning.

"Upon my arrival in town the next day I went up to see Mr. Hayne. I told him I thought we might be in shape to make him some money on his gin transaction. I told him of the meeting, my meeting, with Mr. Price Douglas, and he stated that if I could get an understanding with them to sell it and if we could get thirty-seven thousand five hundred dollars for the gin to go ahead and sell it. Some discussion was had between us on the price. I told him we could probably get thirty-five thousand dollars, but I doubted that we could get thirty-seven fifty, and right there in Mr. Hayne's office he told me to go ahead on that basis and that he would pay a commission.

"I went back to my office and I immediately called Mr. Price Douglas and told him of the conversation with Mr. Hayne and asked Mr. Douglas to make an appointment with Mr. Hart and some other representative of the Southern Cotton Oil Company that Mr. Hart had mentioned to Mr. Douglas, or that had to be consulted. I asked for that appointment to be made at the hotel at Ferriday. I made the trip over there. Mr. Douglas said he would make the appointment. I made the trip over and picked Mr. Douglas up and we drove back to Ferriday. We attended to a

little matter there, and I came back to the Brookwater Store, following Mr. Hart. Mr. Hart made the statement to me that he thought his company would be interested in the gin, if they could buy it at the right price; that he had no authority in the matter, but suggested that I contact Mr. Klopp. Mr. Klopp lived at some town in South Louisiana, either Churchpoint or Villeplatte —I am not sure which. I telephoned Mr. Klopp and Mr. Klopp talked to me and made an appointment to come to Alexandria. He said he would be in Alexandria the Saturday following. I made an appointment for him to come to my office at 2:00 o'clock for a discussion of the matter. He did not come. He did not keep his appointment.

"Q. Your conversation with Mr. Hayne about that occurred some time prior to the tender of the deed? A. That is correct. I would not know the exact date on that, but I fixed the time because I made the trip over to Vidalia in an effort to complete the final closing of this transaction, that is the transaction whereby the title was conveyed to these various farm tenant purchasers of the Brookwater Plantation."

The Court, in a spirit of conciliation said: "The Court is impressed with the fact that he believes both witnesses have endeavored according to their recollection to tell the truth. When you take the testimony of each and compare it, there is very little difference in what they have said. It is merely a matter of construction they have put on the circumstances. They have more or less corroborated each other, and I don't think there is any necessity of going into it further and getting other details from other witnesses at all."

But, taking the story in its minimum significance, it is expressive of the fact that the agent of the plaintiff, after plaintiff's failure to comply with its obligation by November 1st, and after complying only middlingly with its obligation on the ginning contract, was still making arguments and presenting factual advantages to make the sale. The indication is that plaintiff did not think defendant was bound after November 1st.

Additionally, Mr. Hayden on rebuttal said: "There is something else I want to add. In my conversation with Mr. Hayne at the time I tendered the deed he made this remark: 'This deal has not worked out as it was represented, and I want to discuss the matter with my attorney, Mr. Watson, before I do anything else.' I resented the statement that anything had been misrepresented to him, and asked him in what respect. He says, 'It is in respect of these tenant purchasers; I understand very few of them have moved on the property, and I don't think they will raise any cotton there at all.'"

Suppose we go back and read in the contract the following: "* * * this agreement to buy and to sell is conditioned upon the execution by Gilbert K. Alford and his various assignees covering portions of the Brookwater Plantation of written agreements binding and obligating the said Gilbert K. Alford and his various assignees to gin the cotton produced on the Brookwater Plantation with the Natchitoches Oil Mill for a period of five years, provided that the cost of ginning and the services rendered and the prices for seed paid shall be those prevailing in the community. If Gilbert K. Alford and ninety per cent of his assignees who are tenant purchasers of the Brookwater Plantation do not sign and execute the said agreement within a period of sixty days then, and in that event this agreement shall be null and void and the Natchitoches Oil Mill will no longer be bound to purchase said gin from the General American Life Insurance Company."

We rule that when Mrs. Evans delivered the ginning contracts in June of 1943, at which time there was not a single sale passed by the plaintiff to any one of these prospective cotton growers, and with the November 1st condition absolutely unfulfilled by the plaintiff, the defendant had not been satisfied under this condition and was not precluded by this undated receipt from exacting on January 24, 1944, the condition that if "ninety per cent of their (Alford's) assignees who are tenant purchasers of the Brookwater Plantation do not sign and execute the said agreements within a period of sixty days, then, and in that event, this agreement shall be null and void, and the Natchitoches Oil Mill will no longer be bound to purchase the said oil mill from the General American Life Insurance Company."

■ So, again, because of the violation by the plaintiff of this obligation on the ginning contracts, its suit is dismissed.

■ Plaintiff's contention that defendant knew the purchasers (ginning-contract signers) were of a class irresponsible financially, knew that they were tenants and sharecroppers, has little merit. It was in

June, 1943, when Mrs. Evans presented the signed contracts. This was good delivery perhaps for a conclusion of the sales of land to them through the Farm Security Administration not later than November 1st. It is no good for a sale on January 22d of the next year. Why? The question answers itself—by that time twenty of the thirty-seven have changed. The defendant was entitled to a set of ginning contracts representing the very persons who would work the land and feel morally obligated to bring the cotton to the defendant's gin. The consequences of the ensuing change of status in this tenant personnel, caused by the default of plaintiff on November 1st, must be borne by the plaintiff.

We rule that when defendant accepted the ginning contracts on June 2, 1943, from the circumstances, particularly because of what the factor of time caused by January, 1944, it was an error of fact in June as to a tender on January 24, 1944, when the sales to the tenants on January 22, 1944, just two days previously, were to only seventeen of the thirty-seven original signers on June 3, 1943.

Since we establish as a fact that the plaintiff failed in this substantial degree in its obligation to furnish ginning contracts, we conclude as a matter of law that this is an active violation of its contract. Art. 1931, Civil Code of Louisiana.

It has been oft and regularly held that great disregard with the terms of the contract is an open and active violation of the contract. Sarrazin v. Alfred A. Adams & Co., 110 La. 124, 34 So. 301. Likewise, the violation is active if that which is done is inconsistent with the promised obligation. Magruder v. Galliber, 6 La.App. 69. When an obligation is to be performed within a specified time, and the time expires without performance, default is not necessary. Red Wing Milling Co. v. Francingues, 1 La. App. 270. Whenever there is a tender of goods, wares, or merchandise inferior in grade to that which is promised, it has been unfailingly ruled that this is an active violation of the contract. Simon v. Baltic American Feed Corporation, Inc., La.App., 152 So. 107.

The proffer in June, 1943, by the plaintiff was of such a character, to its knowledge, as to lull the defendant into failure to check or investigate.

■ And in instances of active violation, as a matter of law, the defendant in this case was under no obligation to put the plaintiff in default. Civil Code Art. 1932.

Then it follows that the discussion of Article 1933 of the Civil Code, so lengthily entered into by the plaintiff, is immaterial and irrelevant, since no damages are sought by the defendant, and the violation by the plaintiff has been active, and furthermore, since an active violation of this one of the two obligations of the plaintiff is sufficient to defeat plaintiff's suit.

From the facts and the applicable law on this phase of the case alone, the suit of plaintiff is dismissed.

■ Counsel for plaintiff attempts to make much by alleging that "defendant did not put plaintiff in default before deed was tendered, and defendant cannot rescind in this suit." This position is taken by plaintiff after it had argued that specific performance should be ordered. Plaintiff contends that neither in the paragraph under consideration, nor elsewhere, is there agreement fixing a time limit short of May 1, 1944, when plaintiff had to perform. That there is any basis for such a statement we cannot see. To say that November 1st was not fixed as a time for the delivery of these sales is just simply to blind oneself and not read the language in the paragraph. We have already written much on the point that time was of great significance to the defendant, and was certainly of the essence of the contract as far as it be concerned. But time was of the essence of the contract to the plaintiff as well; it was the owner of the whole plantation and of the gin and the gin site; it was operating the plantation and gin during the year 1943. It had tenants growing the cotton, and since the defendant by the agreement had become a prospective buyer of the cotton gin, it leased the cotton gin to defendant, guarding well to let the lease end on the last day of the year. Why? Because if by November 1st they had failed to deliver the deeds to Alford, etc., and the defendant did not by written agreement exercise its option of extending for six months the time within which the sales to Alford could be delivered, the Brookwater Plantation would remain on its hands at the end of the year, and plaintiff wanted the gin with it.

Our interpretation of the contract is that the defendant did not have to place the plaintiff or anyone in default. The contract speaks for itself. The sales to Alford were not delivered by November 1st;

the defendant did not in any manner, particularly in writing, extend the time of six months within which the sales could be delivered.

The defendant had nothing to say or do; and when the plaintiff tendered its sale for it to sign and wanted the $30,000, all it had to do was refuse.

But there was another good reason for the defendant to refuse the tender, and that was because it had been misled on the ginning contracts to come from the cotton growers who never, in the majority, even live on the premises—and it was a separate condition of the contract to be fulfilled by the plaintiff, the failure in which vitiated the agreement.

Mr. Hayden, through his own evidence, appreciated this fact, and he kept on from time to time discussing the transaction with Mr. Hayne. There was no prohibition of both sides talking about the sale of this gin and gin site.

We cannot agree with the plaintiff when it says that its failure to tender deed by November 1st, if a violation, was only passive, and putting in default by defendant was necessary. That position might have been taken *if* there were not the further fixed condition, left to the option of the defendant, to continue or not to continue this written commutative contract affecting real estate for a period of six months.

When defendant remained silent, it was a declaration that it did not desire to extend; as we have already shown, there is no writing about it.

Moreover, defendant is not seeking damages (has never asked or pleaded for any) for the failure of plaintiff to comply with its promise on November 1st; consequently, waiving its rights to damages under Arts. 1912 and 2047, it did not put plaintiff in default. Plaintiff errs when it urges this waiver (a shield to it against damages) as an extension of the contract (a sword for it in its fight).

"The effects of being put in default are not only that, in contracts to give, the thing, which is the object of the stipulation, is at the risk of the person in default; but in the cases hereinafter provided for it is a prerequisite to the recovery of damages and of profits and fruits, or to the rescission of the contract." Art. 1912, La.C.C.

"In all cases the dissolution of a contract may be demanded by suit or by exception; and when the resolutory condition is an event, not depending on the will of either party, the contract is dissolved of right; but, in other cases, it must be sued for, and the party in default may, according to circumstances, have a further time allowed for the performance of the condition." Art. 2047, La.C.C.

So, plaintiff's position that there was an obligation on defendant to put the plaintiff in default is all misplaced.

All of the Code articles, and the cases thereunder, towit, Temple v. Lindsay, 182 La. 22, 161 So. 8, Hall v. Lorente, 3 La. Ann. 274, Gayden v. Louisville, N. O. & T. R. Co., 39 La.Ann. 269, 1 So. 792, United Shoe Stores, Inc. v. Burt, La.App., 142 So. 370, are inapplicable.

In the case of Temple v. Lindsay, supra [122 La. 22, 161 So. 11], one of the obligations was to drill a well "with due and reasonable diligence" until completed. There was no specified time limit set for the completion of the well. In the instant case we have the fixed date of November 1st, and time was of the essence, what is due and reasonable diligence under various circumstances is difficult of interpretation, and that is the reason why in a complaint for the breach of the contract there must be a default shown.

"The law depreciates the taking of snap judgment in cases of this kind and compels the obligee to give his obligor fair warning if he intends to dissolve the contract." Temple v. Lindsay, 161 So. at page 11.

There is much difference in the equity of this case as compared to the equity of the instant case. Temple had gone to much expense in drilling a well on the Lindsay property, and for the contract to be vitiated and all his labor and expenses lost to him just on the snap judgment of Lindsay that Temple was not proceeding with due and reasonable diligence would be decidedly unfair. The actual well and all the information it gave remained the property of Lindsay.

In the instant case the plaintiff had to hustle to pass these sales to Alford and his associates (all small farmers) because it had a very dominant personal and selfish interest to do so, and that was to get the $107,500 from Uncle Sam. Delivery to the defendant was an ancillary interest.

These various assignees taken from the class of share-tenants likely were intended to become individual property-owning independent progressive farmers. It was no lost

effort to the plaintiff to continue seeking these sales after November 1st. It was hustling for the $107,500. When the contractual relations in the instant case are discontinued, the defendant has nothing of the plaintiff. The gin goes back to plaintiff at expiration of lease, for which plaintiff has collected $1,500. They are in their original situation.

Finally, there is no condition in the Lindsay case at all approaching this discretionary factor left in the defendant of extending the time for the delivery of the sales six months. Silence on that point by the defendant, and the failure of plaintiff to get such an extension in writing just ended that particular contract, without the possible infiltration under its facts of Articles 2046 and 2047 of the Civil Code.

Who will deny that the underlying philosophy requiring default in these articles is that no one should enrich himself at the expense of another? This case is not an example to support the reason for the rule.

The case of Gayden v. Louisville, N. O. & T. R. Co., supra, in which most eminent counsel appeared on both sides, is fundamentally different in facts from the case at issue here, and consequently we find that the principles of law in the former do not apply in the latter. A recital of three of the headnotes of the case will help to shorten its discussion:

"The condition that, should a railroad *not* be built within a stated time, the contract giving right of way shall be null and void, is *resolutary* in character.

"Until the dissolution is judicially demanded for non-performance, the obligor has the right to comply with his part of the contract.

"An obligor who is present during the performance of the obligation, *after* the expiration of the delay, who does not object, and allows the work to be completed, cannot be permitted by suit, brought more than a year afterwards, to demand the value of the land taken for the building of the road, and claim damages consequent on the use of the grant, and which were in the contemplation of the parties when the contract was entered into."

The fundamental difference between the two cases is that when the railroad was not built within a stated time, the right of way was not to be donated—and that was called a resolutary condition. The result, however, would be that the railroad was extant just the same, and the donor of the property would have all of the benefits of its operation and existence. To change the situation from a donated right of way to that where the landowner would be paid, and with damages, on the use of the property, the Court held that the contract came under Article 2047 of the Code, and a dissolution of the relation between the parties had to be judicially demanded at the expiration of the stated time for the building of the railroad.

The fundamental difference in our case is that when November 1st passed, the date of completion for furnishing the sales, it remained in the interest of plaintiff, just as it remained in the interest of the railroads, to continue. In the former case, however, the railroad remained on the premises of the defendant, its land was used for the purpose, and defendant was seriously affected; there were benefits to come from the use and operation of the railroad, but there was the property taken, etc. In the instant case, however, the defendant was untouched; there was nothing of his taken or used; he was unaffected. The defendant would keep its $30,000, and the plaintiff would keep its gin. When the relation is severed, when the contract is vitiated in our instant case, there is nothing to settle between the parties. One is not hanging in the hair of the other.

The case of Hall v. Lorente, supra, is inapposite, because there was no specific time fixed in the contract for the performance of the condition.

The case of Carland v. City of New Orleans, 13 La.Ann. 43, and of Lyons v. Dymond and Lally, 23 La.Ann. 709 (though uncited by plaintiff), are of the same category as the Gayden v. Louisville, N. O. & T. R. case, and fall for the same reasons given above.

The case of Southport Mill v. Ansley, 160 La. 131, 106 So. 720, is fundamentally different from the instant case because, though a commutative contract, and there was an offer of sale of property for a certain price, there had been actually deposited the price of $10,000. The significant difference in the cases lies in the fact that the seller in the former case was constantly ready to deliver (the very opposite here), but there are always delays, and his offers became vain efforts. There was a filing in the alienation records in the parish of the situs of the property, of the offer and the acceptance of the sale. There had been a

delay in the acceptance of the deed, first of five months and eighteen days before there was a default thereon on a suit to set aside the contract, and there was a further delay of fourteen days before an answer was filed in the suit, and at this juncture the defendant was offering the balance of the purchase price of $90,000. The Court held it to be too late.

Fundamentally, this case has nothing to do with the instant case, because there was utmost persistence in performance on the part of the plaintiff. In this case the plaintiff fails at the appointed date, fails again at the date of December 31, created by argument of plaintiff, and additionally fails on January 22, 1944, in the character of its ginning contracts.

Also, we must repeat again, there is the extension of time within the discretion of one party which takes all these cases out of the rule of law providing for a judicial dissolution, under Articles 2045, 2046, and 2047.

We quote from defendant's brief:

"The articles of our Code which deal with resolutory conditions and the right to dissolve a contract if the condition be not met, generally apply to performed, or executed contracts, and not to those which remain in the executory state. These conditions generally apply where a man has made a sale coupled with delivery and possession, and there is a clause in the contract which states that the sale shall depend upon the performance of certain obligations or acts on the part of the vendee, which he fails to do. The resolutory condition which is implied in all such contracts, even without it being expressly stated, gives the vendor the right to rue back and to demand that the contract be dissolved and the parties be placed in the same position that they were before the sale. * * *

"The articles of the Code which deal with resolutory conditions would have been applicable in the case before you if the facts were different. Let us imagine that General American, instead of entering into a contract of purchase and sale with Natchitoches, had actually made a sale and delivered the property, and had received the price. Going further let us suppose that the sale had contained a statement that in the event General American failed to sell the remainder of Brookwater Plantation by November 1st, that then Natchitoches would have the right to demand a rescission of the sale. Now, we have imagined a case where the resolutory condition and the codal articles with reference thereto truly applies."

Furthermore, in all the cases cited by the plaintiff the basis is that deeds have been executed, title has passed, deliveries of land or merchandise have been made. In the instant case, though the contract be commutative in classification, it is merely a promise to do something upon a certain condition, and upon the condition falling the contract has all the elements of an option under our law. To have renewed this option, that is, extended the agreement for six months, a writing was essential and sacramentally necessary.

For study of what happens when an obligee fails to take action, see: In re Industrial Homestead Ass'n, La.App., 198 So. 528; Barchus v. Johnson, 151 La. 985, 986, 92 So. 566; Price et al. v. Town of Ruston, 19 La.App. 356, 139 So. 55; Moresi v. Burleigh, 170 La. 270, 127 So. 624; Elmer v. Hart, 121 La. 537, 46 So. 619.

Accordingly to this opinion, judgment will be signed in favor of defendant and against the plaintiff.