(100 South. 544)

No. 24596.

**INTERSTATE TRUST & BANKING CO. v. LAPLACE.**

(May 5, 1924.

*(Syllabus by Editorial Staff.)*

1. **Brokers ☞40—Claim that stock was purchased at unauthorized price could not be made after acquiescence.**

Where directors of defunct bank had agreed to pay commission on purchases by plaintiff of stock, with interest, and to pledge stock to indemnify him against loss, defendants, who had not complained while purchases were being made, could not claim that limit not above par was to apply to each purchase, and not to average price, in view of Rev. Civ. Code, art. 1956.

2. **Brokers ☞72 — Agreement to purchase stock to support price thereof construed.**

In suit on agreement by directors of defunct bank to pay commission on purchases of stock, to support price thereof *held*, that such agreement covered only stock purchased and held, and not stock purchased and sold.

3. **Brokers ☞72—Directors of defunct bank held personally liable under agreement for commissions and interest on purchase of stock of such bank.**

In action on agreement by directors of defunct bank to pay commissions with interest on stock purchased by plaintiff to support price thereof, directors, binding themselves individually, were personally responsible for such commission and interest.

4. **Brokers ☞72—Liability for interest under agreement for purchase of bank stock held to terminate when bank ceased to be going concern.**

Where bank directors individually bound themselves to pay plaintiff a commission on purchase of stock and interest thereon, in order to sustain the price of the stock, liability for interest terminated when bank ceased to be a going concern.

5. **Appeal and error ☞820—Supreme Court may appoint expert to report on long and intricate accounts.**

Since no court, much less an appellate court, is required to investigate for itself long and intricate accounts, in view of Code Prac. art. 443, Supreme Court may appoint experts to report on such accounts.

6. **Interest ☞46(1)—Interest held due on commissions on bank stock purchases from judicial demand.**

On contract by bank directors to pay commission and interest on purchases of stock by plaintiff, to sustain price thereof, plaintiff *held* entitled to interest on sums due for commission from time of judicial demand, in view of Rev. Civ. Code, arts. 1935, 1938, 1940.

7. **Interest ☞17—Not recoverable on sum due for interest, in absence of express contract.**

Under Rev. Civ. Code, art. 1934, interest cannot be recovered on a sum due for interest, in absence of express contract.

Appeal from Civil District Court, Parish of Orleans; Hugh C. Cage, Judge.

Action by the Interstate Trust & Banking Company against Albert J. Laplace. Judgment for defendant, and plaintiff appeals Amended and affirmed.

Spencer, Gidiere, Phelps & Dunbar, of New Orleans, for appellant.

Dart & Dart, of New Orleans, for appellee.

By Division C, composed of OVERTON, ST. PAUL, and THOMPSON, JJ.

ST. PAUL, J. On April 25, 1910, the directors of the late People's Bank & Trust Company, acting *individually* but in the interest of said bank, entered into an agreement in the form of a letter addressed to, and accepted by, plaintiff, as follows:

We, the undersigned, request you to protect the stock of the People's Bank & Trust Company by purchasing as many shares thereof as may be necessary not to exceed 1,000 shares, at a price not above par; and in consideration therefor *we obligate ourselves to pay you a commission* of two and one-half per cent. per share, par value, *and to pay interest* on your investment at the rate of six per cent. per annum; said commission and interest to be prorated in proportion to the number of shares to be pledged as hereinafter provided; *and,* in order to indemnify you against any loss on account of said purchase, *we severally obligate ourselves to pledge to you* the number of shares in said company set opposite our several names, or a proportionate number thereof necessary to make the number of shares pledged equal fifty per cent. of the number of shares purchased by you, said shares to be delivered indorsed in blank at your request.
"[Signed]  Albert Laplace........69 shares
"[Signed]  Sundry Other Directors
             ..................442 shares"

We have italicized portions of said letter, so as to emphasize the *two* distinct agreements which it contains; the one *to pay* a commission on purchases and interest on the investment, the other *to pledge* certain shares of stock to indemnify plaintiff against loss on such investment.

**I.**

The 511 shares of stock were thereupon duly delivered; and between April 27th and May 6th plaintiff bought 664 shares of People's Bank Stock (par value $100) at various prices ranging from 95 to 101. On May 16th plaintiff bought 32 shares at 101, and *sold* 10 shares at the same figure. Between May 19th and July 8th plaintiff bought 258 shares at 101. On July 25th the market dropped to 90, at which price plaintiff purchased 10 shares. Up to that date plaintiff had purchased in all 964 shares for a total of $95,161.50, of which it had sold 10 shares for $1,010.

Thus, on July 25, 1910, after which plaintiff ceased buying, it had in hand 954 shares, for which it had paid $94,151.50, and average of $98.70 per share.

Thus, also plaintiff's purchases had kept the market for said stock steadily *one point above par* from May 16th to July 8th.

As the directors of the People's Bank kept in touch with its affairs, and as they themselves were interested in the stock thereof to the extent of at least 511 shares, it is no violent presumption to assume that they were fully aware that plaintiff was purchasing the stock at 101, and doubtless quite well satisfied that plaintiff should do so; said stock having thus been advanced 6 points above the 95 at which it stood on April 27th, when plaintiff began purchasing.

[1] It is therefore now too late to claim that the limit "not above par" was to apply to each several purchase and not to the average price for the whole. R. C. C. 1956.

**II.**

[2] On the other, since the object of the agreement was to *protect* the stock of the bank, and prices are kept up by demand and not by supply, it follows that the obligation to pay commissions and interest could apply

only to such shares as plaintiff *purchased and held*. For, had the plaintiff purchased and sold, 1,000 shares, its presence in the market would have had no effect thereon; since the increased demand would have been fully offset by the increased supply. Nor was plaintiff authorized by the agreement to purchase *and sell;* and the reason is obvious. For the intent was that plaintiff should acquire, and especially that it should *hold*, 1,000 shares of stock; since there was to be an "investment," on which the directors were to pay interest, which of course meant *an outlay of capital;* and, further, it was surely not contemplated by the directors that they should pay commissions on an indefinite number of shares to be purchased, out of which 1,000 were to be held.

We therefore think that the agreement covered only the 954 shares purchased *and held* by plaintiff at a cost, as aforesaid, of $94,-151.50.

### III.

From this certain consequences flow: The first, that the commission due by the directors was $2.50 per share (2½ per cent. par value) on 954 shares, say $2,385; and, secondly, that plaintiff was entitled to hold in pledge only 477 shares (one-half of 954) out of the total of 511 shares delivered—since the directors bound themselves to pledge to plaintiff only such "proportionate number of shares (set opposite their several names, as might be) necessary to make the number of shares pledged equal 50 per cent. of the number of shares purchased (and held)." And as this defendant's proportion of said 477 shares was as 69 to 511, it follows that plaintiff's pledge covered only 64 shares belonging to him, being 5 shares less than the 69 which he delivered. And, accordingly, since out of the liquidation of the People's Bank plaintiff received $12.70 per share, it follows that it collected from that source (out of defendant's shares) $63.50 in excess of its pledge.

And since the agreement clearly shows that the directors did not bind themselves *personally* to indemnify plaintiff for any loss on said shares ("on account of said purchase"), *and no such claim is herein made,* it follows that this defendant is entitled to credit for said amount against any sum herein otherwise found to be due by him.

As to the commissions on purchases (and interest on investment), the agreement provides that these shall be prorated among the directors "in proportion to the number of shares *to be pledged";* so that defendant's proportion thereof is as 64 to 477. And we fix that share at $320.

### IV.

[3] As to the *personal* liability of the directors for the commissions and interest on investment, the agreement seems sufficiently clear to require no other need for interpretation than a reading thereof. But at all events, since the directors wanted the bank stock *protected* and this could not be done by *selling their shares,* it follows that the commission and interest were to come from some other source, and the only visible source was the personal responsibility therefor of the directors themselves.

### V.

These details disposed of, we come now to the *two serious and difficult questions* involved. The first is, for *how long* were the directors obligated to pay interest on plaintiff's outlay? The second is, do they owe *interest* on said interest? For plaintiff prays for such interest from judicial demand.

As the object or purpose of the contract was to protect the stock by keeping it at or near par, through purchases to be made as aforesaid, and as the parties presumably meant to bind themselves not only *reasonably* but also *validly,* it follows that they must have had in contemplation that this was something which, "by the nature of the thing"

itself, was at least *possible* at the time the undertaking was gone into. R. C. C. 1891, 1892, 2031. But as plaintiff did not bind itself at all events to keep said stock at par, but only *to purchase (and hold) as many shares as might be necessary to do so, not however exceeding 1,000 shares,* it follows that the possibility of keeping the stock at par was the *condition* on which the obligation to buy and hold depended.

This was certainly plaintiff's interpretation of the agreement, when it ceased further buying after July 25th, the stock having then fallen to 90.

On the other hand, the directors seem not to have complained that plaintiff did not then and there seek shelter, by throwing upon the market all its holdings (including both purchases and pledged stock).

And our conclusion is that all parties were *at that time* well satisfied to let the matter stand in *statu quo* and await developments.

But on March 20, 1911, plaintiff purchased the portfolio of the People's Bank and assumed liability for all its deposits; whereupon the bank necessarily ceased to be a going concern.

Then and there it became evident that the object of the agreement had failed absolutely, and each party knew that it faced an inevitable loss.

Now, an obligation to pay interest perpetually is, in effect, an obligation to pay eventually the capital sum on which that interest is based; since there is no way of avoiding further payment of interest than by paying said capital sum. See, also, R. C. C. 2796.

[4] But since, as aforesaid, the directors assumed no personal liability as to the outlay which plaintiff was to make, it follows necessarily that they did not bind themselves for *the equivalent* thereof, to wit, the payment of interest thereon *perpetually.* Hence their liability for interest must cease at some time; and our conclusion is that it should cease, *at the latest,* when the directors ceased to have any further interest in the stock; which was precisely when the bank ceased to be a going concern and there could be no further hope of rehabilitating the stock.

We say it should cease then *at the latest;* because plaintiff, being under no obligation to suffer a loss upon its purchases beyond what might be covered by the pledged stock, was no longer under obligation even to hold the stock when it fell to 65.80 on the market; for at that figure the whole 1,431 shares (954 purchased, plus 477 held in pledge) just sufficed to cover its outlay of $94,151.50 as aforesaid; in other words, the *margin* was then exhausted. See, also, R. C. C. 2055. And since plaintiff had the *right* to get out of the market then, and (in theory at least) might have done so without loss to itself, we think the obligation of the directors to pay interest ceased at that point. But, as we said before, the parties were evidently all content to drag along, on the principle perhaps that *whilst there is life there is hope,* and we conclude that in all equity the directors should pay interest to the date of the final crash, to wit, when the bank ceased to be a going concern as aforesaid.

## VI.

[5] All parties agree that the trial judge stopped the interest at that time; and it is evident from the judgment he rendered that he fixed the quantum of the interest due at that time by *all* the directors at $4,895.71. Taking a bird's-eye view of this calculation, it cannot be far wrong; and it is not challenged by either side. But we have not undertaken to verify the long calculations by which that figure must have been reached. No court is required to investigate for itself long and intricate accounts, much less an appellate court. Code of Practice, art. 443, and authorities noted in Rochl's Edition thereof. Hence if we thought there was any serious error in the calculations, we would

appoint experts to report thereon, as we have a right to do. Wilcox v. Henderson, 9 La. Ann. 347, 348; Bass v. Chambliss, 9 La. Ann. 376, 389, 390; Sigur v. Crenshaw, 10 La. Ann. 297, 298. But we will not do so in this case unless requested by the parties.

As this defendant's proportion of this $4,-895.71 is as 64 to 477, it amounts to $656.64.

Thus defendant's total liability is as follows:

Proportion of interest....................... $656 64
Proportion of commissions................... 320 00
                                          ─────────
Total ........ . ........ .............. . .... $976 64
Less refund on 5 shares...................... 63 50
                                          ─────────
Net amount due by this defendant......... $913 14

## VII.

[6] For the rest, plaintiff is entitled to interest on $320 due for commissions (at least) from judicial demand as prayed for. R. C. C. 1935, 1938, 1940.

[7] But our conclusion is, after mature consideration, that under R. C. C. 1934, interest *cannot be recovered* upon a sum due for interest, in the absence of *an express contract* therefor. Under what circumstances such express contract may be validly made, it is not necessary to consider now, since there was no contract to that effect made here.

## VIII.

The trial judge allowed plaintiff $997.90, which under the answer to the appeal must be reduced to $913.14 as above. On the other hand, he failed to allow interest on the commissions; which we think due.

## Decree.

The judgment appealed from is therefore amended so as to reduce the amount awarded plaintiff to $913.14, and allow legal interest on $320 thereof, from judicial demand; and as thus amended the judgment is affirmed, at defendant's cost in both courts.