Howard L. MAKOFSKY, Jr.,
Plaintiff-Appellant,

v.

Raymond C. CUNNINGHAM, II,
Defendant-Appellee.

No. 76–3499.

United States Court of Appeals,
Fifth Circuit.

July 24, 1978.

---

86. *J. H. Rutter Manufacturing Co. v. NLRB,* 473 F.2d 223, 243 (5th Cir. 1973).

James J. Morrison, Jr., New Orleans, La., for plaintiff-appellant.

Phillip A. Wittmann, James C. Gulotta, Jr., New Orleans, La., for defendant-appellee.

Before WISDOM,* GOLDBERG, and RUBIN, Circuit Judges,

ALVIN B. RUBIN, Circuit Judge:

Turning our federal robes into Louisiana garments in this multi-issued case arising out of a contract to sell Louisiana land and brought to a federal forum solely because of diversity, we conclude that title to the property was merchantable, the buyer was not justified in his refusal to perform the contract and therefore forfeited his deposit, and, on a companion tort claim, that the seller did not defame the buyer. Good faith in the performance of obligations is an integral part of the fabric of Louisiana's law of obligations[1] and consid-

---

* Judge Wisdom recused himself from sitting in consideration of this case. Accordingly, the remaining two members of this panel, constituting a quorum, dispose of the within case pursuant to 28 U.S.C. § 46(d), *United States v. Zarzour*, 5 Cir. 1970, 432 F.2d 1.

1. The Louisiana Civil Code deals with consensual agreements under the title "Obligations." For present purposes it suffices to equate the concept with contracts at common law. *But cf.* Gorla, The Theory of Object of Contract in Civil Law: A Critical Analysis by Means of the

eration of this duty, interwoven with more literal adherence to the rules of civilian doctrine, leads us to conclude that the district court, which we affirm, was correct in its findings of fact[2] and in the results of their application.[3]

## I.

Cunningham (as seller) agreed to sell 41 acres of land in New Orleans to Makofsky (as buyer) for $3,379,696. The act of sale was to be executed by August 1, 1974, but this time was to be extended to *August 13* if the buyer notified the seller of any title defects or exceptions by July 12. As required by the contract, the buyer put a deposit in the seller's hands, in the form of an irrevocable letter of credit with Colonial Bank for $100,000; this letter represented the deposit "for all purposes of this agreement." The letter of credit provided that the seller could receive $100,000 on or before *August 10* by presenting written certification to the bank that the buyer was in default in performance of the purchase agreement. Thus the deposit letter would be valid for 10 days *after* the scheduled closing date, but would expire 3 days *before* the closing if the date were extended. Although there was testimony concerning why there was a hiatus in dates,[4] the evidence did not directly establish any reason

for it, *or* whether it was inadvertent; this must be determined by inference.

The contract also provided:

In the event Seller fails to comply with this agreement within the time specified or for any other reason, the Purchaser shall have the right either to demand the return of his deposit plus an equal amount to be paid as penalty by the Seller; or the Purchaser may demand specific performance, at his option. In the event the Purchaser fails to comply with this agreement within the time specified, the Seller shall have the right to declare the deposit, ipsofacto [sic], forfeited, and draw upon the letter of credit representing same, without formality beyond tender of title to Purchaser; or the Seller may demand specific performance.

On July 11, the buyer's lawyer timely notified the seller of several alleged title defects and exceptions to the title's merchantability, including a recorded purchase agreement for the same land with one Donald G. Goff. A document purporting to cancel this agreement had been recorded in the public records on May 22, 1974. On August 9, the seller arranged for the American Title Insurance Company to issue a title binder at the closing in favor of the buyer insuring against all of the alleged defects.

Comparative Method, 28 Tul.L.Rev. 442, 453–460 (1954); Litvinoff, Of the Promise of Sale and Contract to Sell, 34 La.L.Rev. 1017 (1974); Nicholas, Rules and Terms—Civil Law and Common Law, 48 Tul.L.Rev. 946 (1974). *See generally,* Planiol, 2 Civil Law Treatise §§ 155–1657 (1959); S. Litvinoff, 6, 7 Louisiana Civil Law Treatise (1, 2 Obligations) (1969, 1975). Although Professor Litvinoff's treatise has been cited only in a few places in this opinion, it could properly have been cited much more frequently, for it is an invaluable and long needed exposition of Louisiana's law of obligations developed in accordance with classic civilian tradition.

LSA-C.C. art. 1901 provides: "Agreements . . . must be performed with good faith." This implies that "they should be performed according to the parties' intent and in conformity with recognized standards of honesty and loyalty." Litvinoff, *id.*; 2 Obligations § 4 at 6.

**2.** They have not been shown to have been erroneous, let alone clearly so. F.R.C.P. Rule 52(a);

*United States v. United States Gypsum Co.,* 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766; *Valley Cement Industries, Inc. v. Midco Equipment Co.,* 5 Cir. 1978, 570 F.2d 1241; *Noel v. Kline,* 5 Cir. 1963, 325 F.2d 496.

**3.** Albeit we take somewhat a different view concerning the application of certain principles of Louisiana law.

**4.** The seller's attorney testified that the expiration date of the letter of credit was fixed as being after the original closing date (August 1) because "[i]t wouldn't have made sense to do it otherwise." He further testified that the closing date could be extended until August 13 rather than August 10 because August 10 was a Saturday when "generally, things were closed." There was no direct testimony concerning why the parties did not expressly stipulate in advance for the possible continuation of the letter of credit beyond August 10 if the closing date were postponed.

It became apparent that the sale could not be completed by August 10, and the seller therefore demanded that the deposit letter be extended. The buyer's lawyer promised that this would be done. However, partially because the buyer's original collateral had been unsatisfactory and partially because the buyer had vacillated with respect to the time extension, indicating at one time that he did not wish the extension and, at another, that he did, the bank, after some negotiations, refused to extend the letter of credit beyond August 10.

On the morning of August 9, the last banking day before the letter expired, the seller's attorney certified that the buyer was in default and received $100,000 from the bank. As a result, the bank applied the buyer's bank accounts to his indebtedness and sued in state court for the balance due, interest, and attorney's fees.

On the same day, the buyer's attorney obtained and notarized an affidavit from Goff in which Goff swore that the recorded cancellation of his purchase agreement was a forgery and that he had neither signed nor authorized it. The affidavit was recorded and sent to the seller's attorney on August 12.

The buyer immediately filed this action seeking damages from the seller for breach of contract, including return of the deposit, payment of the $100,000 penalty, loss of profits on resale of the property, bank charges for funding the letter of credit, and attorney's fees. He sought damages for libel and slander for the alleged false certification to the bank that the buyer was in default. In the alternative, should the court find that he was not entitled to damages for breach, the buyer demanded return of the deposit and specific performance of the purchase agreement.

■ The next day, August 13, both parties appeared for the scheduled closing. The plaintiff's attorney had not prepared the closing documents. The Goff purchase agreement was the only possible outstanding defect in the title in controversy that was not to be disposed of at the closing or shortly thereafter on the same day. (In accordance with Louisiana practice, some required items, such as mortgage certificates, would be obtained after the act of sale was recorded.) The seller demanded that the buyer take title, and the buyer refused. A notarial *procès verbal* of default was prepared on behalf of each party.[5] On August 14, Goff cancelled his purchase agreement and signed a sworn statement that he had been in error on August 9 and that he had indeed authorized the original cancellation.

The district court found that, because the buyer had not breached his obligations by August 9, the certification that he was then in default was "premature and in violation of [the seller's] contractual obligations." This violation would entitle the buyer to any damages caused by it, but the trial court found none. It also found that this

---

5. A *procès verbal* is a formal statement of facts attested by or before a public officer such as a notary. *See* LSA–C.C. art. 2234; LSA–R.S. 15:571, 33:262, 35:458; *Lee's Heirs v. Burke*, 1837, 10 La. 534; *Hall v. Hall*, 11 Tex. 526, 539. The term therefore is also used to refer to minutes of an official proceeding or act. At civil law, the notary public has powers and duties that extend beyond the taking of oaths, and the execution of documents to which a notary's duties are frequently confined at common law. *See* LSA–R.S. 35:2–35:4; *Stork v. American Surety Co. of N.Y.*, 1903, 109 La. 713, 33 So. 742. Among the duties the notary public may perform in civilian legal systems are conveyancing of title, drafting of land title documents, holding of family meetings, making of inventories, appraisements and partitions, and reporting to the court concerning documents appearing to be tainted by fraud or duress. *See generally*, Planiol, 2 Civil Law Treatise §§ 130–154 (1959); Burke and Fox, The *Notaire* in North America: A Short Study of the Adoption of a Civil Law Institution, 50 Tul.L. Rev. 318 (1976). *See also* Comment, Writing Requirements and the Authentic Act in Louisiana Law: Civil Code Articles 2236, 2275 & 2278, 35 La.L.Rev. 764, 773–75. In this case, the buyer's attorney described the meeting in which title was to have passed, and placed the seller in default; in his capacity as notary public, he signed the document in the presence of witnesses. The seller's *procès verbal* also described the meeting, placed the buyer in default, and was signed by the seller's attorney, in his capacity as notary public, in the presence of witnesses.

did not amount to the kind of breach of the basic contract to buy and sell that would excuse the buyer from accepting title.

The trial court found no justification for the buyer's non-performance or his assertion that the title was unmerchantable. The court noted that the buyer did not have the funds to purchase the property and held that the buyer's solicitation of Goff's affidavit was "calculated to frustrate defendant's efforts to consummate the transaction." Judgment was accordingly rendered in favor of the seller, recognizing his right to retain the $100,000 deposit, and dismissing the cause of action for defamation. This appeal followed.

## II.

We consider first the hiatus in dates already noted between August 10 and August 13, the effect of the buyer's failure to obtain an extension of the letter of credit, and the resultant cashing of the letter by the seller.

The trial judge found that the contract was clear and unambiguous in requiring a deposit only until August 10, and interpreted LSA–C.C. art. 1963 [6] as precluding the conclusion that the buyer was obligated to extend the letter of credit. The record amply supports the findings of fact; however, we differ with the conclusions that the contract as a whole was unambiguous and that the buyer had no duty to extend the letter of credit.[7]

The letter of credit was issued on the same day as, and as an incident to, the buy and sell agreement. It was not a separate and distinct undertaking but a method of completing the sale agreement by providing security for the deposit that the buyer apparently could not or did not wish to make in cash.

The letter of credit is, of course, unambiguous in its expiration date of August 10, and the contract provides that the letter of credit shall constitute the deposit "for all purposes of this agreement." But the contract also contemplated closing by August 1 and an extension thereafter only at the buyer's request in the event problems arose. Although contracts generally are interpreted to give effect to the intention of the parties [8] as expressed in the written terms of the contract, e. g., Bank of Napoleonville v. Knobloch & Rainold, 1918, 144 La. 100, 80 So. 214, 216; Wilson Warehouse Co. of Texas, Inc. v. Maryland Casualty Co., La.App.1972, 269 So.2d 562; Grace v. Morales, La.App.1968, 210 So.2d 60, 63; Vaughan v. P. J. McInerney & Co., La.App. 1943, 12 So.2d 516, 519, Louisiana courts will not interpret the words of a contract literally when this leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit. LSA–C.C. arts. 1945, 1950; Texaco, Inc. v. Vermilion Parish School Board, 1963, 244 La. 408, 152 So.2d

---

**6.** LSA–C.C. art. 1963 provides:
When the intent of the parties is evident and lawful, neither equity nor usage can be resorted to, in order to enlarge or restrain that intent, nor can any law operate to that effect, unless it be some prohibition or other provision, which the parties had no right to modify or renounce.

**7.** "There is virtually unanimous acceptance of the proposition that the interpretation of a contract is a question of law, not fact, and, therefore, not restricted to review under the 'clearly erroneous' rule. [citing cases]" First National Bank of Miami v. Insurance Co. of North America, 5 Cir. 1974, 495 F.2d 519, 522; Gulf, C. & S.F. Ry. Co. v. Coca-Cola Bottling Co. of Cleburne, 5 Cir. 1966, 363 F.2d 465, 467; Illinois Central Railroad Co. v. Gulf, Mobile & Ohio R. Co., 5 Cir. 1962, 308 F.2d 374, 375; Wright & Miller, Federal Practice & Procedure: Civil

§ 2588. An exception to this rule is the situation in which extrinsic evidence has been used in interpreting the contract. Wright & Miller, id.; Valley Cement Industries, Inc. v. Midco Equipment Co., 5 Cir. 1978, 570 F.2d 1241. The general rule rather than the exception is applicable here since the judge denied any reliance on extraneous evidence by finding the language of the instruments clear and unambiguous.

**8.** The "intent of the parties" often, as here, is the intention of their attorneys. The variance between the acts of the attorneys and the goals of the client is not so great as to preclude us from equating the intent of both. Cf. Jochum v. Schmidt, 5 Cir. 1978, 570 F.2d 1229, 1232 (imputing acts of attorney to client in another context).

541; *Crow v. Monsell*, La.App.1967, 200 So.2d 700; *Molero v. California Co.*, La.App. 1962, 145 So.2d 602.

■ The parties have not suggested, and we cannot discern, any reason other than error or inadvertence for them to have required a deposit that would expire three days before the possible closing date.[9] They were each represented by able counsel experienced in Louisiana real estate transactions. Informed and experienced parties do not ordinarily bind themselves to unreasonable obligations. *Burt v. Hebert*, La. App.1976, 338 So.2d 717, 721, and cases cited therein.

■ The penalty clause provides that the deposit shall be forfeitable if the purchaser fails to comply with the agreement "within the time specified." In determining the intent of the parties, we are obligated to construe the clauses together and interpret the contract as a whole. LSA–C.C. art. 1955; *Reuter v. Reuter's Succession*, 1944, 206 La. 474, 19 So.2d 209, 212; *Housing Authority v. Fidelity & Deposit Co. of Md., Inc.*, La.App.1975, 309 So.2d 920; *Wilson Warehouse Co., supra; see also* LSA–C.C. art. 1951.[10]

■ The words "within the time specified" would ordinarily connote the full time provided for performance as extended by the terms of the contract itself. If the sale had been completed on the original closing date (August 1), the deposit would have been security for its performance until and beyond the time of actual execution. It would be unreasonable to assume that the parties intended that, if the closing date were extended, the letter of credit would be allowed to expire and would not be similarly extended.[11]

■ The characterization in the contract of the letter of credit as constituting the deposit "for all purposes of this agreement" does not mean that its own termination date foreclosed any obligation to renew it. The letter of credit was, indeed, the deposit, instead of cash or some other security; but the terms of the letter of credit must be read in the light of its evident purpose: to provide security for the buyer's performance of his obligations under the contract.

■ The contract is silent concerning what deposit would be required if the closing date were extended, but it is evident that the parties originally intended that there would be a deposit as security for its performance. This purpose could not be accomplished if the deposit lapsed before the contract was performed or breached. Because the deposit letter did not express the entire understanding of the parties, their evident intention to provide for a deposit until the closing date must be taken into account in determining the effect of the events when the letter was not extended. *Washington Aluminum Co. v. Pittman Construction Co.*, 5 Cir. 1967, 383 F.2d 798, 801 (applying Louisiana law); *Boisseau v. Vallon & Jordano, Inc.*, 1932, 174 La. 492, 141 So. 38; *Dockson Gas Co. v. S. & W. Const. Co.*, La.App.1943, 12 So.2d 847.

LSA–C.C. art. 1903 obligates the parties "to everything that, by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect." *Cf.* LSA–C.C. art. 2055, regarding the replacement of security that fails for a *debt.* *See* discussion in Litvinoff, *op. cit. supra* note 1, 2 Obligations § 4 at 8. The buyer was therefore required to have

**9.** *See* note 4, *supra.* This evidence was properly admitted because the contract was uncertain as to the effect of an extension of the closing date on the deposit requirement. *Oelricks v. Ford*, 1859, 64 U.S. (23 How.) 49, 63, 16 L.Ed. 534, 538–39. *Cf. Blanchard v. Gloyd*, La.1844, 7 Rob. 542 (ignoring clerical errors).

**10.** If the letter of credit or penal clause is treated as a separate contract from the real estate agreement, LSA–C.C. art. 2118, the two must

still be read together with other contracts entered on the same subject. *Harper v. Home Indemnity Co.*, La.App.1962, 140 So.2d 653; *see* LSA–C.C. art. 1949.

**11.** *See* note 4, *supra.* The seller's attorney certainly did not contemplate that the buyer could, by claiming title defects by July 12, be excused from the requirement of supplying a deposit through the closing date.

the letter of credit extended or to provide some other deposit after it expired.

When the seller's lawyer walked into the bank on the morning of August 9 and certified that the buyer was in default, the letter of credit was still viable, and the buyer had not yet failed to perform his obligation of supplying a new deposit. The buyer's financial condition may have made it improbable that he would either supply a deposit or ultimately consummate the transaction, but the buyer's actions fell far short of the actual renunciation of the contract or impossibility of performance that would constitute anticipatory breach. *Dingley v. Oler*, 1886, 117 U.S. 490, 6 S.Ct. 850, 29 L.Ed. 984; *Ringel & Meyer, Inc. v. Falstaff Brewing Corp.*, 5 Cir. 1975, 511 F.2d 659; *Johnson v. Thompson*, La.App. 1969, 229 So.2d 131; *Jones v. Whittington*, La.App.1965, 171 So.2d 764. By making this false certification, the seller violated his implied contractual duties as a depositary for the letter of credit. LSA–C.C. arts. 2937, 2938, 2940, 2944. Finding evidence to support the trial judge's determination that the seller's certification was untrue, we do not reach the question whether the seller would be required to put the buyer in default before making a certification of default.[12] Additionally, it is immaterial that the bank may have concluded as of the morning of August 9 that it would refuse to extend the letter when it expired the next day; the buyer was not thereby precluded from providing other forms of adequate security.

The buyer did subsequently breach his obligation to provide security. In this regard, it is immaterial whether the bank, rather than the buyer, refused to extend the letter of credit and whether it did so for reasons other than the buyer's vacillation in requesting an extension. The buyer was not precluded from fulfilling his duty of providing adequate security by the bank's actions; other forms of security would have sufficed. However difficult such arrangements might prove when sought to be performed at the last moment, the buyer was aware before August 10 that the letter of credit would expire on that date and the obligation to extend the deposit, viewed from that perspective, was not impossible to perform as a matter of law.[13]

Having determined that each party is responsible for a breach, we must determine what consequences flow therefrom. This requires an excursion into the Louisiana jurisprudence regarding primary and ancillary obligations.

### III.

When judicial dissolution of a contract is sought, the court has discretion not only to grant further time to perform it but also to determine "whether the performance not rendered by defendant was

---

12. "Putting in default" is a term derived from the Louisiana requirement that a creditor under some circumstances give notice to the debtor of the latter's failure to perform before the creditor may bring suit. Means of satisfying the requirement are enumerated in LSA–C.C. art. 1911. Since failure to extend the letter of credit is a passive breach, LSA–C.C. art. 1931, putting in default would have been required if the seller had brought suit. LSA–C.C. arts. 1912, 1933. See LSA–C.C. arts. 1910, 1914, 1932; Sarpy, The Putting in Default as a Prerequisite to Suit in Louisiana, 1 Loy.L.Rev. 127 (1942); Litvinoff, *op. cit. supra*, note 1, 2 Obligations §§ 173–291. When the contract has not been performed on time, the requirement of putting in default has been excused. 1 Loy.L.Rev. at 128. *See Chattanooga Car & Foundry Co. v. Lefebvre*, 1904, 113 La. 487, 37 So. 38, 42; *Brooks v. Neyrey*, La.App.1964, 167 So.2d 400; *Binnings Construction Co. v. Louisiana Life Ins. Co.*, La.App.1962, 139 So.2d 561, 564; *Williams Lumber Co. v. Stewart Gast & Bro.*, La. App.1945, 21 So.2d 773. Although *Brooks, Binnings* and *Williams* state the principle that putting in default is excused when "time is of the essence," the presence of a "time is of the essence" clause in this case is not sufficient to excuse the seller from putting the buyer in default. 1 Loy.L.Rev. at 136–38.

13. The buyer may have had difficulty in performing, but this is not a case where a fortuitous event or irresistible force has made performance impossible. Louisiana law excusing performance under those conditions is, therefore, inapplicable here. LSA–C.C. arts. 1933(2), 2120; *Hughes v. Breazeale*, 1960, 240 La. 126, 121 So.2d 510; *Admiral Paint Co. v. Goltzman*, La.App.1971, 254 So.2d 104; *Harper v. Home Indemnity Co.*, supra, note 10.

the cause[14] of plaintiff's obligation, in which case dissolution must be granted, or whether the failure in defendant's performance is not so grave as to have deterred plaintiff from entering the contract, had he foreseen it, in which case he will be granted damages or a proportional reduction of his own performance." Litvinoff, *op. cit. supra* note 1, 2 Obligations § 272 at 514; *see also Watson v. Feibel,* 1916, 139 La. 375, 392, 71 So. 585, 591; *Bailey v. Wadley,* La.App. 1938, 185 So. 467, 469–70. Thus Louisiana doctrine recognizes that a breach of an ancillary obligation will neither of itself excuse the other party from performing nor give sufficient justification for legal dissolution of the contract. This principle permits the enforcement of a building contract that has been substantially but not entirely performed.[15]

Many Louisiana cases hold, broadly, that a party to a contract cannot enforce it if he has himself violated it. *See Shreveport Cotton Oil Co. v. Friedlander,* 1904, 112 La. 1059, 36 So. 853; *Stafford, Derbes & Roy, Inc. v. DeGruy,* 1931, 172 La. 160, 133 So. 430; *Di Cristina v. Weiser,* 1949, 215 La. 1115, 42 So.2d 868. However, the breaches in these cases prevented one of the primary, rather than ancillary, purposes of the contract from being fulfilled, *e. g.,* failure to give good title, or to do so on time, or to provide the quantity of goods required by the contract. In accordance with this principle, a buyer who has violated a real estate purchase agreement by failing to make the required deposit can no longer enforce it; the deposit itself at the outset is a primary purpose of agreement considered as a whole. *Samuelson v. Bosk,* 1951, 219 La. 477, 53 So.2d 239; *Bayon v. Pettingill,* La. App.1955, 77 So.2d 202.

That is not the situation presented here with respect to the seller's breach. The holding of the deposit letter by the seller was merely an ancillary obligation. The basic purpose of the agreement was the sale of property. A secondary but important purpose (or cause, as the term is used in the Louisiana Civil Code) was to secure performance by a deposit and a penal clause with respect to seller as well as buyer.

In requiring a deposit, the seller required the buyer to give some security for ultimate performance before he took the property off the market. In agreeing to pay a liquidated sum if he violated the contract, the seller agreed to provide security for his performance. The fiduciary obligations of the seller, however, in his capacity as depositary, merely to hold the letter of credit, are not part of any of the main purposes of the contract. The buyer had an obligation to post a deposit until the title was passed; the false certification and redemption of the letter of credit by the seller in no way frustrated the primary purpose of the contract (the conveyance of title) but actually was in furtherance of the intent of the parties that there be a deposit to insure performance by the buyer. *See Olympic Insurance Co. v. W. D. Harrison, Inc.,* 5 Cir. 1972, 463 F.2d 1049, *cert. denied,* 1973, 410 U.S. 930, 93 S.Ct. 1373, 35 L.Ed.2d 593, excusing performance under Louisiana law where the breach was substantial. *See also Dales Jewelers & Home Furnishers, Inc. v. Jones,* La.App.1967, 204 So.2d 126.

Although not a breach of the purchase agreement, the redemption of the letter of credit before default of the buyer

---

14. "Cause" is a fundamental concept of civil law that may for present purposes be considered as roughly corresponding to the common law notion of consideration. LSA–C.C. art. 1896; Litvinoff, *op. cit. supra,* note 1, 1 Obligations § 251. It also refers to the object of a contract. *Id.* § 214, note 42, §§ 219, 287–289. *See* LSA–C.C. arts. 1764, 1779(4), 1824–1826, 1893–1900. *See generally* Litvinoff, 1 Obligations §§ 196–250, 277–399; Gorla, *op. cit. supra,* note 1; Smith, A Refresher Course in *Cause,* 12 La.L.Rev. 2 (1951).

15. The Louisiana doctrine of substantial performance, under which a breach of a construction contract that does not defeat its purposes does not vitiate the contract, is based on LSA–C.C. art. 2769. *See Lambert v. Jones-McCloskey Const. Co., Inc.,* La.App.1975, 311 So.2d 488; *Sullivan v. Carpenter,* La.App.1966, 193 So.2d 105, distinguishing *B. F. Edington Drilling Co. v. Yearwood,* 1960, 239 La. 303, 118 So.2d 419.

was a breach of a secondary obligation, his obligation to act as depositary. We may analogize this duty to that created by a penal clause. A penal clause is a secondary obligation, LSA–C.C. art. 2117. It supposes two contracts: the principal object of the contract and another contract to do or not to do something if the principal object of the agreement is not effectuated. LSA–C.C. art. 2118. It is an accessory right. Litvinoff, *op. cit. supra* note 1, 2 Obligations §§ 8–9, pp. 13–14. The aggrieved party is entitled to damages if this secondary contract is breached, LSA–C.C. arts. 1907, 1930; but, as we have already seen, this breach does not terminate the principal obligation. Because the breach was of only a secondary obligation, it did not entitle the buyer to return of double his deposit under the penalty clause. Moreover, the seller could not successfully invoke the penalty clause at that moment, even if the obligation that was breached was primary, because of his failure then to tender title to the buyer as required by that clause.

■ When the seller breached his duty by cashing the letter of credit, the only prejudice to the buyer was the damage resulting from the premature funding. The plaintiff contends that these consist of interest charges and attorney's fees charged by the bank, and attorney's fees for the present action. Although attorney's fees have been awarded in similar cases where the purchase agreement provides for them, *e. g., Young v. Stevens,* 1967, 252 La. 69, 209 So.2d 25, 34, there is no such clause in the Makofsky-Cunningham agreement.[16] Absent such a provision in the contract or a statute providing for fees, the Louisiana courts have refused to award attorney's fees when suit was brought for failure to perform a real estate contract. *Scurria v. Russo,* La.App.1961, 134 So.2d 679, 684–85, and authorities cited therein. *See also Nassau Realty Co., Inc. v. Brown,* La.1976, 332 So.2d 206, 210; *Inzer v. Hollis,* La.App.1976,

339 So.2d 522; *Lloyd v. Merit Loan Co. of Shreveport, Inc.,* La.App.1971, 253 So.2d 117, and cases discussed therein; Comment, Attorney's Fees as an Element of Damages in Louisiana, 34 Tul.L.Rev. 146 (1959); Comment, 20 La.L.Rev. 389 (1960). It is doubtful that attorney's fees could be recovered even when the party who has violated a contract is in bad faith. *Compare Fo-Coin Co. v. Drury,* La.App.1977, 349 So.2d 382, 385, and *Smallpage v. Wagner & Wagner,* La.App.1956, 84 So.2d 863, *with Lloyd, supra,* 253 So.2d at 120.

These cases preclude the buyer from recovering attorney's fees for bringing the present action. They do not, however, bar the recovery of attorney's fees incurred by the bank and charged to the buyer for the redemption of the letter of credit. These charges are not attorney's fees incurred by the buyer for the present action but would be consequential damages included in the losses suffered for which this action was brought which might be recoverable under Louisiana law in proper circumstances.

Similarly, the interest charged by the bank might be recoverable. *Compare Interstate Trust & Banking Co. v. Laplace,* 1924, 156 La. 403, 100 So. 544 *with In re Sincere Navigation Corp.,* E.D.La.1978, 447 F.Supp. 672. *See Boston Sand & Gravel Co. v. United States,* 1928, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170. *See also United Suriname Trading Co. v. C. B. Fox Co.,* La.App.1970, 242 So.2d 259, allowing recovery of bank charges for the false funding of a letter of credit where bad faith was present.

Although there is evidence that the buyer was sued in state court by the bank for the interest and attorney's fees, the buyer has not proved that he ever actually became liable to pay them. Nor has he demonstrated that he would not have been charged but for the false certification of the seller. While we do not award the buyer these

---

16. The letter of credit provides that it "is subject to the 'Uniform Customs and Practice for Documentary Credits (1962 Revision), International Chamber of Commerce Brochure No. 222.' " The terms of that brochure are thus part of the letter of credit. Although there might be some provision in the brochure for attorney's fees, the brochure was not introduced into evidence.

charges, we do not preclude him from proving these damages in a subsequent indemnification action.[17]

■ The contract provides that the seller has the right to forfeit the deposit if the buyer fails to comply with the agreement. As explained above, the parties intended the deposit to remain in force until the closing date. Because the buyer failed to fulfill this obligation, the seller was entitled to the deposit. *Samuelson v. Bosk*, 1951, 219 La. 477, 53 So.2d 239; *Bayon v. Pettingill*, La.App.1955, 77 So.2d 202. *Cf. Richmond v. Krushevski*, 1962, 243 La. 777, 147 So.2d 212 (buyer not required to pay liquidated damages where contract, including obligation to make deposit, contingent on buyer's ability to obtain loan).

## IV.

■ Additionally, the seller was entitled to keep the deposit because the buyer breached its obligation to accept title. The contract provided for the transfer of merchantable title. The buyer contends that, even if the seller's certification did not excuse the buyer's performance, because the seller was unable to tender merchantable title, the buyer was excused of his obligation to take title. LSA–C.C. art. 1913; *Fortenberry v. Decay*, La.App.1973, 279 So.2d 725. Title is not merchantable when it reasonably suggests litigation. *Young v. Stevens*, 1967, 252 La. 69, 209 So.2d 25; *Kempff v. Morgan*, La.App.1974, 291 So.2d 520. The title here was merchantable in every regard save the existence of the Goff

affidavit.[18] Although the good faith recordation of such an affidavit would be suggestive of litigation,[19] the trial court was correct under the circumstances of this case in concluding that the buyer was not excused from accepting title.

LSA–C.C. art. 2040 provides, "The condition is considered as fulfilled, when the fulfillment of it has been prevented by the party bound to perform it." *See Cox v. Department of Highways*, 1968, 252 La. 22, 209 So.2d 9. The buyer himself created the flaw on the title in order to frustrate the seller's efforts to consummate the transaction. His efforts to do so violated his duty of good faith. *See* Litvinoff, *op. cit. supra*, note 1, 2 Obligations § 4 at 6–7, analogizing the obligation of good faith to a partnership to perform the contract. While no one should be forced to buy a lawsuit, *Young, supra*, 209 So.2d at 35, quoting *Rodriguez v. Shroder*, La.App.1955, 77 So.2d 216, 224, the defense of unmerchantability here was a sham; it was not raised to protect the buyer's rights, but simply to provide an ostensible excuse to avoid performance of the contract.

The seller would be excused under art. 2040 only if the buyer were *at fault*. *George W. Garig Transfer v. Harris*, 1954, 226 La. 117, 75 So.2d 28; *Briggs v. Siggio*, La.App.1973, 285 So.2d 324, and 313 So.2d 379. The trial court's findings discussed above are sufficient to put the buyer "at fault" for the title defects and defeat his claim that he was excused from performance because title was unmerchantable.

17. Such recovery would be subject to the rule that, if the seller's attorney were in bad faith, the buyer would be entitled to all damages that were the immediate and direct consequence of the breach. If he were not in bad faith, only those damages within the contemplation of the parties when the contract was made could be recovered. LSA–C.C. art. 1934; *United Suriname Trading Co. v. C. B. Fox Co.*, La.App. 1970, 242 So.2d 259. Because the buyer has not proved any damages, we need not resolve these issues. Nor need we decide what res judicata effect, if any, this opinion would have on a subsequent suit.

18. The trial court found that any other defects or encumbrances were either not in controver-

sy or were to be cleared at the closing or shortly thereafter.

19. Although the parties would be entitled to rely on his earlier cancellation of the purchase agreement under the public records doctrine, *Goldsmith v. McCoy*, La.1938, 190 La. 320, 182 So. 519; *Brewster Development Co., Inc. v. Fielder*, La.App.1972, 271 So.2d at 299; *see* LSA–C.C. arts. 2263–2266, a claim that this cancellation was a forgery negates any effect of the cancellation. *Succession of Rosinski*, La. App.1963, 158 So.2d 467. *See* Redmann, The Louisiana Law of Recordation: Some Principles and Some Problems, 39 Tul.L.Rev. 491 (1965).

In reaching this result, we note that, if the title were not otherwise merchantable, the seller's tender of a commitment to issue title insurance would not of itself render it merchantable. On its face, this commitment excluded defects or adverse claims arising after it was issued and not cleared by the date of sale. Because the insurance company may have considered, as we do, the Goff affidavit as the origin of the title defect, there is some question whether the Goff claim would have been covered. More important, a title insurance policy is not equivalent to a merchantable title in Louisiana; it is an agreement by an insurer to satisfy claims against the property. It is limited in coverage to the amount stated on its face. A buyer who erects improvements having a value in excess of the face amount of the policy will not be protected for the excess. In any event, having the right to make claims is not the equivalent of assurance that no claim need be made.

The penalty clause allowed the seller to declare the deposit forfeited "without formality beyond tender of title to Purchaser." While the failure to take title is a passive breach, LSA–C.C. art. 1931; *see Noel Estate, Inc. v. Louisiana Oil Refining Corp.*, 1937, 188 La. 45, 175 So. 744; *Johnson v. Thompson*, La.App.1969, 229 So.2d 131, and, therefore, requires that the buyer be put in default, LSA–C.C. arts. 1912, 1933; *Godchaux v. Hyde*, 1910, 126 La. 187, 52 So. 269; *Gorham v. Hayden*, La.1844, 6 Rob. 450; *Kirkman v. Barton*, 1839, 14 La. 80,[20] this was accomplished by the seller's demand that he take title and by executing the *procès verbal* or formal declaration of default.[21] LSA–C.C. art. 1911(1)(2); *Fortenberry v. Decay*, La.App.1973, 279 So.2d 725; *Bourgeat v. Smith's Syndics*, 1840, 16 La. 467; Sarpy, The Putting in Default as a

Prerequisite to Suit in Louisiana, 1 Loy.L. Rev. 127, 142–143 (1942). Hence, the seller was also entitled to the deposit as liquidated damages for this breach.

## V.

The final issue is the buyer's tort claim for defamation. The trial court correctly rejected this claim.

Louisiana requires the proof of four elements as prerequisites to recovery in an action for defamation:[22] (1) publication, (2) falsity, (3) malice, actual or implied, and (4) resulting injury. *Carter v. Catfish Cabin*, La.App.1975, 316 So.2d 517, 521; *Wilson v. Capital City Press*, La.App. 1975, 315 So.2d 393, 397; Comment, Defamation: A Compendium, 28 La.L.Rev. 82, 90 (1967); *cf.* Restatement (Second), Torts § 558. The trial court found the presence of the first two elements, and the seller does not question their proof. We turn our attention then to malice and resulting injury.

Louisiana courts draw a distinction between statements that are "indisputably defamatory on their face," *Madison v. Bolton*, 1958, 234 La. 997, 102 So.2d 433, 438, and those that are only "susceptible of a defamatory meaning." *Ibid.* When a statement is made that is defamatory *per se*, malice need not be shown. *Carter, supra*, 316 So.2d at 521–22; *Wilson, supra*, and authorities cited therein. Words are defamatory when, *inter alia*, they have "tendency to deprive [a person] of the benefits of public confidence or injure him in his occupation . . . or [have] a natural tendency to injure the person's reputation." *Madison v. Bolton, supra*, 102 So.2d at 437. When the words themselves have those results, even without considering extrinsic

---

20. *See* note 12, *supra.*

21. *See* note 5, *supra.*

22. A civil action for defamation is based on LSA–C.C. art. 2315. *Acme Stores, Inc. v. Better Business Bureau of Baton Rouge, Inc.*, 1954,

225 La. 824, 74 So.2d 43. Louisiana does not distinguish between libel and slander. Prosser, Libel Per Quod, 46 Va.L.Rev. 839, 847–48 (1960); Comment, Defamation: A Compendium, 28 La.L.Rev. 82, 89 (1967).

facts and surrounding circumstances, they are defamatory *per se.* *Id.,* 102 So.2d at 438.[23]

 The words used here were not defamatory *per se.* The seller asserted only that Makofsky was "in default of the Purchase Agreement." The mere assertion that a person has failed or refused to perform a contractual obligation does not, in and of itself, injure that person's business reputation or deprive him of public confidence especially when, as here, they are employed merely to claim a deposit made as security for contractual performance. There was no evidence either that the words used had a natural tendency of this type or that Makofsky in fact suffered any injury of this type. It does not appear that Louisiana courts would draw a legal conclusion that the words used here would constitute defamation *per se.*

When the words used are not inherently defamatory, malice must be shown. *Carter, supra,* 316 So.2d at 521–522. *See Contonio*

*v. Guglielmo,* 1933, 176 La. 421, 146 So. 11, 13; *cf.* Restatement (Second), Torts § 580B.

Although the trial court found that the statement to the bank that Makofsky was in default was false, it also found that Makofsky had not shown, by a preponderance of the evidence, that it was made "maliciously or in bad faith." Although the court did not expressly find that Cunningham acted in good faith, it did so inferentially; this is, of course, tantamount to finding not merely that the plaintiff has not borne his burden of proof but that the defendant has gone further and proved the contrary. The trial court's factual finding is amply supported by the evidence.

 Because Makofsky has not established an essential element of his claim for defamation, we need not go further and inquire into whether or not the statement to the bank was privileged,[24] whether or not damage as a result has been proved,[25] or whether the fault requirement has been met.[26]

AFFIRMED.

**23.** In its discussion of defamatory *per se,* 102 So.2d at 438, the court erroneously uses the term *actionable per se.* 28 La.L.Rev., *supra,* note 22, at 101, note 126. *Defamatory per se* or *slanderous per se* means that malice need not be proved. Malice has been presumed where the words impute to the person the commission of a criminal offense, *Parsons v. Gulf & South American S.S. Co.,* La.App.1967, 194 So.2d 456, *cert. denied,* 1967, 389 U.S. 896, 88 S.Ct. 215, 19 L.Ed. 213, impute a loathsome disease or sexual misconduct, *Goldsmith v. Unity Industrial Life Insurance & Sick Benefit Ass'n,* 1930, 13 La.App. 448, 128 So. 182, or tends to adversely affect the person's business or profession, *Wiel v. Israel,* La.1890, 42 La. Ann. 955, 8 So. 826. *Actionable per se* is a term of the common law meaning that special damage need not be proved, a requirement not present under Louisiana law. *Ford v. Jeane,* 1925, 159 La. 1041, 106 So. 558; *Jozsa v. Moroney,* 1910, 125 La. 813, 51 So. 908, 911; *Miller v. Holstein,* 1840, 16 La. 389; *Wilson v. Capital City Press,* La.App.1975, 315 So.2d 393, 397; 46 Va.L.Rev., *supra,* note 22, at 847–48, 852; 28 La.L.Rev., *supra,* note 22, at 94–98. *See* Restatement (Second), Torts §§ 569–574. For a discussion of the confusion in this area, *see* 28 La.L.Rev., *supra,* note 22, at 100–103.

**24.** There is qualified privilege to make statements with reasonable grounds for believing them to be true in reference to subjects in which the person communicating and the person to whom the statement is made have an interest or a duty, including a business interest. *Madison v. Bolton,* 1958, 234 La. 997, 102 So.2d 433; *Ward v. Sears, Roebuck & Co.,* La.App. 1976, 339 So.2d 1255, 1261, 28 La.L.Rev., *supra,* note 22, at 93; Comment, 6 La.L.Rev. 281 (1945).

**25.** "With regard to proof of injury Louisiana has recognized that injury to reputation can result simply from the character of the defamatory words, though proof of pecuniary loss is impossible." *Wilson, supra,* note 23, 315 So.2d at 397; 28 La.L.Rev., *supra,* note 22, at 94–100, and cases cited at 89, notes 43–45; Note, 22 Tul.L.Rev. 335, 337 (1947). Of course, special damages, if proved, are recoverable. *Kennedy v. Item Co., Inc.,* 1948, 213 La. 347, 34 So.2d 886, 894; 28 La.L.Rev., *supra,* note 22, at 97–100.

**26.** *Gertz v. Robert Welch, Inc.,* 1974, 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789, allows states to define appropriate standards of liability for defamation of private individuals, "so long as they do not impose liability without fault." *See Wilson, supra,* note 23, 315 So.2d at 397–98; Note, 49 Tul.L.Rev. 685 (1975).